In re STAUNTON INDUSTRIES, INC., Debtor.

James L. GUY and James L. Mann, Plaintiffs,

v.

G.E. GROGAN, Brad Osgood, Norman Levy Associates, Inc., and Fidelcor Business Credit Corporation, Defendants.

Bankruptcy No. 85–03379–R.

Adv. No. 86–1146–R.

United States Bankruptcy Court, E.D. Michigan, S.D.

July 17, 1987.

See also, Bkrtcy., 74 B.R. 501.

---

1. This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to     Bankruptcy Rule 7052.

Louis Burnett, Birmingham, Mich., for plaintiffs.

Robert Handler, Chicago, Ill., for defendants.

## SUPPLEMENTAL MEMORANDUM OPINION

STEVEN W. RHODES, Bankruptcy Judge.

### I.

This matter is before the Court on an adversary proceeding complaint filed by the debtor's landlords, James L. Guy and James L. Mann (the landlords), against Fidelcor Business Credit Corporation (Fidelcor), which is the secured creditor of the debtor, Staunton Industries, Inc. (Staunton). The landlords seek to charge Fidelcor for the costs and expenses of preserving Fidelcor's collateral. The complaint is brought pursuant to 11 U.S.C. § 506(c).

Specifically, the landlords seek reimbursement of unpaid rent and property taxes totalling approximately $119,000 during the one-year period that Staunton was in Chapter 11, from October 2, 1985 through October 3, 1986. The landlords contend that these expenses were reasonable and necessary, and that Fidelcor was benefited by these expenses to that extent.

Fidelcor, on the other hand, denies that it received any benefit from Staunton's use of the landlords' property while in Chapter 11. Specifically, Fidelcor contends that Staunton's attempt to reorganize in Chapter 11 was not intended to benefit it, and did not result in any benefit to it, because it was well over-secured when the case was filed. Thus, Fidelcor contends that regardless of the bankruptcy, it would have been paid in full. Fidelcor also denies that the costs and expenses, as asserted by the landlords, were reasonable and necessary.

The landlords respond that Fidelcor was under-secured, and that the Chapter 11 attempt to reorganize did benefit Fidelcor by allowing it to recover its full claim. The landlords also contend that Fidelcor was benefited by its continued receipt of interest from Staunton, and by avoiding the costs of liquidation on its collateral, including collection costs, auction costs, attorney fees, and storage fees.

The Court's findings of fact and conclusions of law following trial are set forth in this supplemental memorandum opinion.

### II.

Staunton filed its Chapter 11 petition on October 2, 1985. At that time, Staunton occupied two buildings owned by the landlords, upon which it was obligated to pay monthly rent and taxes. There was a substantial pre-petition rent arrearage at the time the case was filed.

In January of 1986, an order permitting Staunton to assume the lease was entered, which set forth the obligations of the debtor to cure the arrearage and to pay continuing rent.

By October 3, 1986, the date the case was converted to Chapter 7, Staunton had accrued the rent arrearage now sought by the landlords from Fidelcor.

Fidelcor first loaned money to Staunton in June of 1984. Fidelcor is an asset based lender which loaned money to the debtor on three different bases. The first basis was an accounts receivable loan pursuant to which Fidelcor loaned money to Staunton upon the receipt by it of an invoice to a customer of Staunton; the loan was 85% of the receivable. Fidelcor collected on this loan when Fidelcor received payment from the customer; the payment went either directly to Fidelcor or through Staunton. In connection with those receipts by Fidelcor, Fidelcor kept a certain percentage and allowed Staunton to retain a certain percentage.

The second type of asset based loan was an inventory loan based on the value of the inventory, with a cap of $100,000 or 25 percent of the value of the inventory, whichever was lower.

Both the accounts receivable loan and the inventory loan were revolving loans.

The third type of loan was a term loan secured by the machinery and equipment. Staunton simply paid a fixed amount each month on this loan.

The parties disagree concerning the total amount of the loan outstanding, as well as the value of the collateral, as of the date of the filing. Fidelcor contends that the outstanding loan amount was approximately $710,000, based on collateral worth approximately $1,300,000 at that time. The landlords contend that the outstanding amount of the loan at the time of filing was $827,000, including a $60,000 advance made by Fidelcor to Staunton immediately after the filing, and that the collateral was then worth approximately $710,000. Thus, the landlords contend that Fidelcor was somewhat undercollateralized in its loan at the time the case was filed.

The Court concludes that the evidence overwhelmingly supports Fidelcor's assertions that it was substantially oversecured when the case was filed, that the value of the collateral did approximate $1.3 million, and that the loan outstanding at the time of filing was approximately $710,000.

During the Chapter 11 proceeding, Fidelcor was paid approximately $500,000 pursuant to the loan formulas in the loan agreements and the cash collateral orders. Upon conversion to Chapter 7 and the subsequent auction sale of Staunton's assets, Fidelcor was paid the balance of its claim in the approximate amount of $266,000, although it has since been ordered to repay $2,500 of that amount.

### III.

11 U.S.C. § 506(c) provides:

The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

The cases construing Section 506(c) reflect some divergence of opinion as to its proper interpretation. Most particularly, there is a divergence of opinion as to the plaintiff's burden in showing benefit to the secured creditor.

■ The Court concludes that it is most appropriate to adopt and apply the standard set forth in *In re Wyckoff,* 52 B.R. 164 (Bankr.W.D.Mich.1985), for several reasons. First, as discussed below, it is based upon a Sixth Circuit decision which this Court is obligated to apply. Second, *Wyckoff* appears to state the view held by the majority of cases. Finally, the Court is persuaded by the analysis in the *Wyckoff* case that its holding should be applied in this case.

■ The Sixth Circuit case upon which *Wyckoff* relies is *In re Louisville Storage Company,* 93 F.2d 1008 (6th Cir.1938), *aff'g per curiam,* 21 F.Supp. 897 (W.D.Ky. 1936). Although that case was decided under the Bankruptcy Act of 1898, it is clear

that Section 506(c) was intended only to codify the prior law under the 1898 Act. Accordingly, cases decided under that Act are applicable even under Section 506(c). This point was made clear in the *Wyckoff* case itself. 52 B.R. at 165.

In *In re Louisville Storage Company,* the court stated:

> ... [A]djudication in bankruptcy would not affect valid existing liens on the property of the bankrupt at the date of adjudication, and, for the protection of lien holders on the sale of such property in the bankruptcy action, the proceeds arising therefrom should be paid to the lienholder without charging against him any of the expenses of administration solely for the benefit of the general estate.
>
> .     .     .     .     .
>
> It has always been the rule inherent in general principles of equity that the lienholder must bear the expense of bankruptcy administration which is solely for his benefit, or to which he consents, or which he causes. [Citations omitted.]

21 F.Supp. at 899.

The court in *Wyckoff* then discussed three additional cases decided by the various Courts of Appeal, including *In re Flagstaff Foodservice Corp.,* 739 F.2d 73 (2d Cir.1984); *Brookfield Production Credit Association v. Borron,* 738 F.2d 951 (8th Cir.1984); and *In the Matter of Trim-X, Inc. (General Electric Credit Corp. v. Levin & Weintraub),* 695 F.2d 296 (7th Cir. 1982). In addition, the court discussed and quoted at length from 3 *Collier on Bankruptcy* ¶ 506.06 (15th ed. 1985). After reviewing and discussing this authority, the court stated the rule as follows:

> It appears, from a review of the relevant authority, that in order for the trustee to recover expenses from the secured creditor, he must establish either that the expenses result in a direct quantifiable benefit to the secured creditor which enabled him to realize as much or more than he would have by enforcing his own security, or that the creditor consented directly or by implication aris-

ing from some kind of affirmative conduct.

52 B.R. at 167.

The Court notes that this interpretation is consistent with a subsequent decision by the Court of Appeals for the Second Circuit in *In re Flagstaff Foodservice Corp. (General Electric Credit Corp. v. Peltz),* 762 F.2d 10 (2d Cir.1985).

### IV.

■ In applying that standard to the present case, the Court concludes that the landlords have not established by a preponderance of the evidence any direct quantifiable benefit to Fidelcor which enabled Fidelcor to receive more as a result of Staunton's use of the landlords' property in its attempt to reorganize under Chapter 11, than it would have received if it had enforced its security interest outside of bankruptcy. Rather, the evidence shows that Fidelcor did not benefit at all from the Chapter 11 attempt to reorganize. Fidelcor could have received the full benefit of its bargain, and could have recovered all expenses of liquidation, if it had so proceeded when the bankruptcy was filed.

Thus, it is clear that Staunton's Chapter 11 attempt to reorganize was for the primary, if not exclusive, benefit of the debtor and its principals, as well as the unsecured creditors. Staunton and its principals benefited by the attempt to reorganize because the attempt provided at least an opportunity to continue in the business. Likewise, unsecured creditors benefited because the attempt provided at least an opportunity to receive an increased repayment on their claims.

The Court concludes that Fidelcor's receipt of interest upon its continuing loans to Staunton during the Chapter 11 is not the kind of direct, quantifiable benefit to the secured creditor which is intended to be addressed in Section 506(c). There is simply no authority in support of that assertion.

Further, the Court finds that Fidelcor did not consent to or cause the expenses. Clearly, there was no explicit consent; the landlords do not contend that there was.

Further, there is no evidence that Fidelcor controlled the payment of Staunton's bills or told Staunton which bills to pay or not to pay, or told Staunton to pay the rent or not to pay the rent. In fact, there is no evidence whatsoever that Fidelcor had any knowledge that Staunton was not paying its rent until September of 1986. In these circumstances, the Court concludes that there is no basis to find either consent or cause.

In the final analysis, there is nothing in this case which distinguishes this Chapter 11 administrative rent expense claim from any other Chapter 11 administrative expense claim which might be made in the case, such as on behalf of trade creditors, or employees, or others. Those creditors, as much as these landlords, contributed to Staunton's attempt to reorganize under Chapter 11, and contributed to Staunton's continuing business during this time period. To open the door to claims by all such Chapter 11 administrative claimants against a secured creditor who provides financing during the Chapter 11 case would have the unfortunate result of discouraging secured creditors from providing or continuing financing. Thus, on these policy grounds, the Court concludes that the more stringent standards of benefit set forth in *Wyckoff* are appropriate.

### V.

The landlords rely primarily upon three cases. The first is *In re McKeesport Steel Castings Company (Equitable Gas Co. v. Equibank, N.A.)*, 799 F.2d 91 (3d Cir.1986). That case sustained a Section 506(c) claim by a gas company which had supplied gas to the debtor's premises where the bank's collateral was stored and used during a Chapter 11 proceeding. After reviewing the several different standards that the courts have applied under Section 506(c), the Third Circuit stated:

> We choose to follow the broad interpretation of benefit used in *Afco Enterprises* [35 B.R. 512 (Bankr.D.Utah 1983)]. As the bankruptcy court recognized, preserving McKeesport Steel Castings as a going concern benefited Equi-

bank. The bankruptcy court found that 'Equibank three times agreed to the use of cash collateral and the provision of the original order permitting payment of utility bills with same was never modified. Furthermore, almost all of the gas service for which Equitable seeks payment was used in Debtor's manufacturing process. Equibank and Condek agreed to the sale of the Debtor's assets as a going concern and the purchase price included customer lists and work in process. If gas service had been terminated, Equibank's and Condek's recovery would have been significantly less since these assets either would not have existed or would have been worth little, if anything. Equibank particularly would have been affected because its security interests in inventory and accounts receivable were subordinated to certain other claims in paragraphs 4 through 7 of the Third Cash Collateral Order.' Indeed the bankruptcy court held that '[t]he continued gas service in the instant matter benefited both Condek and Equibank in that it preserved the Debtor's business and permitted the sale of the assets as a going concern which provided a greater return to the secured parties than they would have received in other circumstances.' [Citations omitted.]

799 F.2d at 94.

The finding in *McKeesport Steel* that the continued gas service resulted in a greater return to the secured creditor is directly contrary to the finding in this case (Part IV, above) that Staunton's use of the landlords' premises to attempt reorganization in Chapter 11 did not provide Fidelcor with an opportunity to obtain any greater return than it would have absent bankruptcy. This fact clearly distinguishes the *McKeesport Steel* case, and therefore, that case provides no authority for the relief sought here by the landlords.

The two other cases relied upon by the landlords more directly involve § 506(c) claims by landlords. One is *In re Isaac Cohen Clothing Corp.*, 39 B.R. 199 (Bankr. S.D.N.Y.1984), a case that would constitute authority for the relief sought by the landlord here. On its facts, the case is essen-

**704**

tially identical to the case presently before the Court. Nevertheless, the Court concludes that in light of *Wyckoff*, that case should not be adopted and accepted. Moreover, *In re Isaac Cohen Clothing Corp.* does not discuss the benefit issue; it simply states as a conclusory statement that the secured creditor was benefited. Accordingly, the Court rejects the application of *In re Isaac Cohen Clothing Corp.* in this case.

The final case relied upon by the landlords is *In re Atlantic Boat Builders Company*, 5 BCD 128 (Bankr.M.D.Fla.1979). Again, this case would be substantial authority for the relief sought by the landlords. But again, for the reason this Court rejected *Isaac Cohen*, the Court must reject *Atlantic Boat Builders Company*.

### VI.

The Court has been concerned as to how it could happen that Staunton could use the landlords' premises throughout this ill-fated Chapter 11 proceeding without compensation. The answer to this concern, however, must lie in 11 U.S.C. § 365(d), which provides all of the protection that landlords need, if it is properly applied. That section specifically provides that when a lease is assumed, the debtor must give adequate assurance of future performance. Here however, the landlords failed to negotiate with Staunton for any adequate assurance of future performance. Although the order allowing Staunton to assume the lease contains very substantial and detailed provisions regarding Staunton's obligation to cure the arrearage and regarding what rent Staunton was to pay on an ongoing basis, it is devoid of any provisions regarding adequate assurance of future payment of rent. This failure is substantially the cause for the landlords' unfortunate position.

Accordingly, the complaint is dismissed.