## In re MMS BUILDERS, INC., Debtor.

### Civ. No. 89–2152 (CSF).

United States District Court,
D. New Jersey.
June 19, 1989.

Ravin, Greenberg & Zacklin, Bruce J. Wisotsky, Roseland, N.J., for VLJ Construction Corporation.

Vernon & Aaron, James G. Aaron, Shrewsbury, N.J., for Peter Costanzo Auctioneers.

St. John, Oberdorf, Williams, Edington & Curtin, Bruce S. Edington, Newark, N.J., for Chemical Bank.

Markowitz & Zindler, Roberta DeAngelis, Lawrenceville, N.J., for Stewart Tile Company.

Meyner and Landis, Linda Snyder, Newark, N.J., for National Westminister Bank N.J.

## OPINION

CLARKSON S. FISHER, District Judge.

This is an appeal from a bankruptcy court order awarding compensation and expenses to Peter Costanzo Auctioneers and Appraisers, Inc. ("Costanzo Auctioneers"), the auctioneer appointed by the court to conduct a public auction of certain real property which was the subject of the bankruptcy proceeding. National Westminster Bank N.J. (formerly known as The First Jersey National Bank) ("NatWest") has appealed that portion of the order directing it to pay a pro-rata share of the award to the auctioneer. The appeal is opposed by Costanzo Auctioneers, secured creditors Chemical Bank, New Jersey, National Association (formerly known as Horizon Bank, National Association) ("Chemical") and VLJ Construction Corporation ("VLJ"), and Stewart Title Agency of Middlesex ("Stewart Title"), an interested party. For the reasons stated below, the decision of the bankruptcy court is affirmed.

On October 13, 1987, an involuntary Chapter 7 bankruptcy petition was filed against MMS Builders, Inc. ("MMS"). The Chapter 7 proceeding was converted to one under Chapter 11 upon application by MMS on October 15, 1987. At the time of the filing, MMS was involved in the construction of two residential projects in Holmdel, New Jersey. One of the projects, a multi-lot subdivision known as Hickory Hills, was financed by NatWest and was in the early stages of construction. Eight of the lots, however, were under contract of sale. The second project was called Raven's Nest and was financed by Chemical. The construction on the lots at Raven's Nest ranged anywhere from 25 to 90 percent complete.

On February 8, 1988, the bankruptcy court issued an order granting NatWest, Chemical and VLJ partial relief from the automatic stay provisions of 11 U.S.C. § 362 to allow these creditors to proceed with state foreclosure actions to judgment only. The stay continued in place with regard to sale of the properties involved. David P. Michaels was appointed as Trustee.

On September 7, 1988, the bankruptcy judge signed a consent order acknowledging NatWest's status as a secured creditor under 11 U.S.C. § 506 and fixing its perfected first mortgage lien at $2,715,904.28 as of July 31, 1988. The automatic stay was further lifted so that the Trustee could proceed to sell four of the Hickory Hills lots to the original contract purchasers, with the net proceeds to be applied to the outstanding balance due NatWest. The Trustee was allowed an additional 120 days to market, on an exclusive basis, the remaining Hickory Hills lots;[1] however, at the expiration of the 120 days, NatWest would be granted complete relief from the automatic stay to proceed with a foreclosure sale on any lots which remained. In the event that the Trustee sold the property, the order provided that NatWest pay administrative costs and expenses based on the following schedule:

5. That the Trustee retain $10,000 of the proceeds from the sale of the four lots towards administrative expenses.

·    ·    ·    ·    ·

---

1. Any contracts for sale of the remaining lots had to be approved jointly by the Trustee and NatWest.

8. That in the event the Trustee sells the remaining seven lots, the proceeds thereof shall be paid to [NatWest] in the following amounts:

(a) If the total net proceeds paid to [NatWest] from the sale of the 11 Hickory Hill lots exceeds $2,700,000, the Trustee shall retain a total of $20,000 towards administrative expenses (including the $10,000 set forth in paragraph 5);

(b) If the total net proceeds paid to [NatWest] from the [sale of] the 11 Hickory Hill lots exceeds $2,800,000, the Trustee shall retain a total of $30,000 towards administrative expenses (including the $10,000 set forth in paragraph 5);

(c) If the total net proceeds paid to [NatWest] from the [sale of] the 11 Hickory Hill lots exceeds $2,900,000, the Trustee shall retain a total of $40,000 (including the $10,000 set forth in paragraph 5);

(d) If the total net proceeds paid to [NatWest] from the [sale of] the 11 Hickory Hill lots exceeds $3,000,000, the Trustee shall retain a total of $50,000 (including the $10,000 set forth in paragraph 5).

On November 4, 1988, the bankruptcy court issued an order allowing the sale, by auction, of 11 of the Raven's Nest lots to the highest bidder.[2] The order also provided that the sale was to be financed by Chemical, VLJ, Stewart Title and James Yacenda (a guarantor of the Chemical Bank loan) in accordance with an agreement reached among the parties. The court directed the four parties to advance the costs of marketing and advertising, up to $15,000.00, to the auctioneer.

After three of the contract purchasers for the Hickory Hills lots failed to close title, the bankruptcy judge entered an amended consent order on December 14, 1988, modifying the September 7, 1988, consent order. The December 14, 1988, consent order provided for the sale of the sole remaining Hickory Hills lot under contract. Again, the Trustee was permitted to retain $5000 of the proceeds for this one

sale and $5000 from the sale of the first three of the ten remaining lots, to be applied towards administrative expenses. Under the December 14, 1988, consent order, the Trustee was given until January 7, 1989, to market the ten remaining lots exclusively and, in addition, was given the authority to sell the property, by auction, in accordance with the court's November 4, 1988, order.[3]

In the event that the Trustee was successful in selling the Hickory Hills property, the December 14, 1988, consent order contained the identical provisions regarding payment of administrative expenses to the Trustee as did the September 7, 1988, consent order. The amount of administrative expenses to be paid by NatWest to the Trustee was again based on the total net sales price of the lots; however, the December 14, 1988, consent order expressly provided:

8. That any costs incurred in connection with the marketing, advertising and auctioning of the remaining ten Hickory Hills lots will be the responsibility of the Trustee and not [NatWest].

It is undisputed that the Raven's Nest creditors were not parties to this consent order and were not aware of its provisions.

A public bid was conducted by Costanzo Auctioneers, and the highest bulk bid received on the Hickory Hills property was $2,408,000.00. The sale was confirmed by order of the bankruptcy court on January 31, 1989, and a closing on the sale was held in May 1989. The net proceeds for the sale, by auction, of the Hickory Hills lots was $2,381,392.90. The closing on the sale of the single lot to the original contract purchaser had occurred prior to the auction, on December 8, 1988, and resulted in net proceeds of $231,184.33. NatWest received $226,189.33 from that sale following the deduction of $5,000 for administrative expenses for the Trustee. Thus, the total net sales from the Hickory Hills property amounted to $2,612,577.23.

---

**2.** The remaining lot, No. 26.14, was sold to the original contract purchasers.

**3.** NatWest retained final approval of all auction bids on the remaining ten Hickory Hill lots.

On January 30, 1989, Costanzo Auctioneers filed a motion for an order compelling the Trustee to pay over the auctioneer's allowance from the proceeds of the closings of the auctioned real property and to apportion the allowance against the secured parties, who were to receive the proceeds of the funds. The auctioneer sought $71,-370.00 in commissions from the auction and an additional $6,048.86 to cover marketing and advertising expenses incurred over the $15,000.00 already advanced by Chemical, VLJ, Stewart Title and James Yacenda. Two hearings were held, one on February 27, 1989, and another on March 8, 1989, regarding the amount of fees requested and the sources from which payment would be made.

On March 27, 1989, following the hearings, the bankruptcy court issued an order granting the auctioneer's allowance and compelling apportionment and payment among the secured creditors. That same day, the court amended its order. The final amended order approved the full amount of the commission requested by the auctioneer ($71,370.00), as well as the additional fees sought for expenses or unreimbursed costs ($6,048.86), for a total expense allowance of $21,048.86. The court allocated 40% of the expense costs, or $8,419.86, to NatWest for the sale of the Hickory Hills property and 60% of the expense costs, or $12,629.00, to the Raven's Crest secured creditors. Since the Raven's Crest group had already advanced $15,000.00 to the auctioneer for the auction's marketing expenses, the court determined that the group was entitled to a credit of $2,371.00, payable by NatWest.

With regard to the auctioneer's commission, the court charged 60%, or $40,451.31, to the Raven's Nest sale. Of this amount, the court allocated the sum of $13,483.77 to the Trustee, and the balance of $26,967.54 to Chemical and VLJ. The court charged the remaining 40% of the auctioneer's commission, or $30,918.69, to the Hickory Hills sale. The court allocated $20,612.46 to NatWest and $10,306.23, to the Trustee.[4] It is from this order that NatWest appeals.

NatWest advances two arguments in support of its request that this court reverse the bankruptcy court's March 27, 1989, order. First, it asserts that the decision of the bankruptcy court to apportion the auctioneer's commission and marketing expenses pro rata among the secured parties, notwithstanding a prior consent order entered into between NatWest and the Trustee which limited NatWest's responsibility for administrative expenses to $10,-000.00, was arbitrary and capricious. Specifically, NatWest contends that no legal basis existed under Fed.R.Civ.P. 60(b) for the court's modification of its prior order. Second, NatWest argues that, even absent the existence of the consent order, Costanza Auctioneers would still be unable to look to NatWest for payment of its fees, because no benefit was conferred on NatWest by the auction, as required by 11 U.S.C. § 506(c).

■ With the sole exception of Chemical, all of the parties in the instant case have proceeded on the premise that the disposition of the first issue presented by NatWest is controlled by Federal Rule of Civil Procedure 60(b). Rule 60(b) sets forth six grounds on which a party may seek relief from a judgment or order of the court. In part, it provides:

> **(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc.** On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a *final* judgment, order or proceeding for the following reasons ... (emphasis added).

The language of the rule explicitly restricts its application to *final* judgments or orders. A "final order is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945). To be final, the order must be more than " 'just a provisional disposition of the issues' " or a " 'step towards final disposition on the merits.' " *New York v. United*

---

**4.** In total, the Trustee was ordered to pay one-third of the auctioneer's commission.

*States Metals Ref. Co.,* 771 F.2d 796, 799 (3d Cir.1985) (quoting *Rodgers v. United States Steel Corp.,* 508 F.2d 152, 159 (3d Cir.), *cert denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975)).

The court concludes, at the outset, that the amended consent order entered by the bankruptcy court on December 14,. 1988, was not a final order, but was interlocutory in nature. In addition to setting a payment schedule for administrative expenses, the order lifted § 362's automatic stay, permitting the Trustee to market the debtor's Hickory Hills property for a limited time. If the Trustee was unsuccessful in selling the property within this time frame, the court authorized him to abandon it, and NatWest, as a secured creditor with a first mortgage on the property, would then be allowed to conduct a foreclosure sale. The sale of the property, however, was always subject to the court's approval and continuing supervision. Moreover, the possibility always existed that a sale of the property would realize greater funds than the amount covered by NatWest's lien, requiring further adjudication of any claims held by general creditors. Clearly, this order did not adjudicate the rights of all the parties who had claims with regard to the Horizon Hills land. Hence, the court holds that the December 14, 1988, amended consent order was an interlocutory order entered during the pendency of a bankruptcy proceeding and, as a result, not subject to the procedure outlined in Rule 60(b) for modification of final judgments and orders.

The Federal Rules of Civil Procedure do not expressly address modification of interlocutory orders;[5] however, Fed.R.Civ.P. 54(b) does provide:

> [a]ny order ... which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order ... is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

Furthermore, it is well settled that a federal court which enters an interlocutory order has the inherent power to reconsider or revise the order in the interest of justice. *John Simmons Co. v. Grier Bros. Co.,* 258 U.S. 82, 88, 42 S.Ct. 196, 198, 66 L.Ed. 475 (1922); *United States v. Jerry,* 487 F.2d 600, 604–05 (3d Cir.1973); *Schering Corp. v. Schering Aktiengesellschaft,* 667 F.Supp. 175, 185 (D.N.J.1987); Advisory Comm. Notes to Fed.R.Civ.P. 60(b) ("interlocutory judgments are not brought within the restrictions of [Rule 60(b)], but rather are left subject to the complete power of the court rendering them to afford such relief from them as justice requires").

Moreover, it is immaterial that the interlocutory order modified by the court was entered by consent. A consent decree is no less a judgment within the control of the court than a judgment entered on the merits following litigation. *United States v. Swift & Co.,* 286 U.S. 106, 114–15, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932); *United States v. City of Miami, Florida,* 664 F.2d 435, 439 (5th Cir.1981); *Webster Motor Car Co. v. Zell Motor Car Co.,* 234 F.2d 616, 619 (4th Cir.1956). Thus, the contractual aspects of an interlocutory consent decree do not prevent a court from exercising its equitable power to modify it to the extent necessary to administer justice prior to the entry of a final judgment. *See United States v. Swift & Co.,* 286 U.S. at 114–15, 52 S.Ct. 460, 76 L.Ed. 999; *Webster Motor Car Co. v. Zell Motor Car Co.,* 234 F.2d at 619.

It is clear that these same principles apply with equal force to a bankruptcy court sitting in equity. *In re Lintz West Side Lumber, Inc.,* 655 F.2d 786, 789 (7th Cir. 1981); *In re Meter Maid Indus., Inc.,* 462 F.2d 436, 439 (5th Cir.1972); *In reMonsour Medical Center,* 5 B.R. 715, 717 (Bankr.W. D.Pa.1980). In the instant case, if the December 14, 1988, amended consent order, with its $10,000.00 cap on administrative expenses, were allowed to stand, the other secured parties would be forced to bear the

---

**5.** Fed.R.Civ.P. 60(a) is not applicable here, because its reach is limited to the correction of mistakes which are clerical in nature, and does not encompass alterations of decisions deliberately made. *See Stradley v. Cortez,* 518 F.2d 488, 493 (3d Cir.1975).

burden of paying the auctioneer's commission and marketing expenses for the auction and sale of property they had no interest in. At the time the November 4, 1988, order was entered allowing the sale, by auction, of the Raven's Nest property, the secured creditors were unaware that the Hickory Hills property would later be included in the auction. Furthermore, the Raven's Nest secured creditors had not been put on notice of the consent order prior to its entry.

The bankruptcy judge immediately recognized the inequity inherent in allowing a consent order to stand which affected the rights of third parties who were not signatories to the order, and exercised his plenary power to modify the interlocutory consent order. In doing so, the bankruptcy judge was not bound by Rule 60(b)(5)'s strict standard of "changed circumstances," as NatWest contends, but instead, had the discretion to apply general equitable principles in making his determination. *See Huk-A-Poo Sportswear, Inc. v. Little Lisa, Ltd.*, 74 F.R.D. 621, 623 (S.D.N.Y. 1977). Thus, the contention that the bankruptcy court was without authority to modify its prior order has no merit.

Having resolved that it was well within the bankruptcy court's discretion to vacate that part of the December 14, 1988, consent order, which provided for a fee arrangement regarding administrative expenses between NatWest and the Trustee, the court must next address whether NatWest is responsible, under 11 U.S.C. § 506(c) for payment of the costs associated with the sale of the property by the auctioneer. Section 506(c) of the Bankruptcy Code provides:

> (c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property *to the extent of any benefit to the holder of such claim.*

11 U.S.C. § 506(c) (emphasis added).

■ It is well settled that the general administrative expenses of a reorganization cannot be charged against a secured creditor, but are the responsibility of the debtor's estate. *In re Flagstaff Food Serv. Corp.*, 739 F.2d 73, 76 (2d Cir.1984); *In re Trim–X, Inc.*, 695 F.2d 296, 301 (7th Cir. 1982); *In re Perrett*, 63 B.R. 978, 984 (Bankr.N.D.N.Y.1986). Notwithstanding this rule, a secured creditor can be compelled under 11 U.S.C. § 506(c) to pay the reasonable and necessary costs of sale of the property securing its claim to the extent the expense was incurred for the benefit of the secured creditor. *In re Trim–X, Inc.*, 695 F.2d at 296; *In re Stanton Indus. Inc.*, 75 B.R. 699, 702 (Bankr.E.D.Mich. 1987); *In re Codesco, Inc.*, 18 B.R. 225, 228 (Bankr.S.D.N.Y.1982); *In re Truitt*, 15 B.R. 169, 171 (Bankr.N.D.Ga.1981).

■ NatWest presents substantially the same arguments here as were presented to the bankruptcy court. Essentially, NatWest asserts that it derived no benefit from the auction because the entire amount of its lien vas not realized, and the alternative route of sale by a sheriff's foreclosure was available to NatWest after January 7, 1989, under the consent order. Thus, NatWest argues, the auctioning of Hickory Hills was undertaken not for NatWest's benefit, but in an attempt to obtain a sale price greater than NatWest's lien and thereby benefit the general creditors. The bankruptcy court, noting the extensive time and effort put forth by the auctioneer and the unusually high number of people who attended the auction and placed bids,[6] seriously questioned NatWest's ability to obtain a sale price equal to or greater than that realized by the auction by utilizing a sheriff's foreclosure sale, and rejected NatWest's arguments.

11 U.S.C. § 506(c) is a codification of the bankruptcy law in existence at the time of its enactment. *In re Codesco*, 18 B.R. at 228 (citing House Report No. 95–595, 95th Cong., 1st Sess. (1977) 357; Senate Report No. 95–989, 95th Cong., 2d Sess. (1978) 68, U.S.Code Cong. & Admin.News 1978, pp. 5787, 5854, 6313). In those instances where part of the proceeds from the sale of

---

6. The evidence before the bankruptcy court showed that the auction was attended by over 500 people and that 163 people posted $30,-000.00 each in order to qualify to place a bid.

the encumbered property was sought under the old Bankruptcy Act, benefit was equated with the costs associated with preserving and/or selling the property. *See In re Truitt,* 15 B.R. at 171, and the cases cited therein. These costs were usually measured by the actual foreclosure costs saved by the lienholder by allowing the property to be sold through the debtor's estate. *In re Codesco,* 18 B.R. at 229; *In re Truitt,* 15 B.R. at 171. Thus, NatWest should bear at least the reasonable and necessary costs of selling the Hickory Hills property which it would have incurred in recovering and selling the property through a foreclosure proceeding and a subsequent sheriff's foreclosure sale. *In re Perrett,* 63 B.R. 978, 985 (Bankr.N.D.N.Y.1986).

At the time of the auction, NatWest had already proceeded with a state court foreclosure action to the point of judgment; however, NatWest still faced the prospect of a sheriff's foreclosure sale and the costs normally associated with it. Pursuant to N.J.Stat.Ann. § 22A:4–8, a sheriff who conducts a foreclosure sale is entitled to charge a fee equal to 4% of any sum not exceeding $5000.00, and 2½% on any amount recovered in excess of $5000.00.[7] Thus, even if NatWest could have sold the Hickory Hills property by foreclosure for the same amount recovered by auctioning the lots through bulk bidding, the fees charged by the sheriff for the foreclosure would have run approximately $60,000, a substantially higher fee than that charged to NatWest for the cost of the auction.

Moreover, the court agrees with the bankruptcy judge's assessment of NatWest's ability to obtain the same return on a sheriff's foreclosure sale as it did on a widely advertised and marketed auction of the Hickory Hills property. In light of the broad interpretation given to the term "benefit" by the Third Circuit, *see In re McKeesport Steel Castings Co.,* 799 F.2d 91, 93 (3d Cir.1986), and this court's estima-

tion of what a foreclosure sale would have cost NatWest under New Jersey law, the court finds that NatWest clearly derived a "benefit" from the auction.

Accordingly, the decision of the bankruptcy court apportioning Costanzo Auctioneer's commission and marketing expenses among the secured parties is affirmed. No costs.

---

7. N.J.Stat.Ann. § 22A:4–8 provides, in pertinent part:

When a sale is made by virtue of an execution the sheriff shall be entitled to charge the

following fees: On all sums not exceeding ... $5,000.00, 4%; on all sums exceeding ... $5,000.00 on such excess, 2½%