**In re FERNCREST COURT PARTNERS, LTD., Debtor.**

**Akram DANIEL, Plaintiff–Appellant,**

v.

**AMCI, INC.; Corson & Buckey, Inc., Defendants–Appellees.**

No. 94–3263.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 24, 1995.

Decided Sept. 22, 1995.

Todd B. Portune (argued and briefed), and Donald J. Rafferty, Cohen, Todd, Kite &

Stanford, Cincinnati, OH, for Plaintiff–Appellant.

Terence L. Fague (argued and briefed), and Susan Guthrie Newhart Elliott, Coolidge, Wall, Womsley & Lombard, Dayton, OH, for Defendants–Appellees.

Before: RYAN and SILER, Circuit Judges; MILES, District Judge.*

SILER, J., delivered the opinion of the court, in which RYAN, J., joined. MILES, D.J. (pp. 783–784), delivered a separate dissenting opinion.

SILER, Circuit Judge.

Plaintiff Akram Daniel challenges the district court's decision affirming the bankruptcy court's award of a brokers' commission to Defendants AMCI, Inc. and Corson & Buckey, Inc. ("Corson & Buckey") for their assistance in attempting to sell the single asset of the bankruptcy. For the reasons stated herein, we affirm.

## I.

Ferncrest Court Partners, Inc., the present debtor in bankruptcy ("Debtor"), owned a residential complex called Ferncrest Apartments. Home Life Insurance Co. ("Home Life") held a first mortgage on the property to secure a $2 million loan. Daniel, the original owner of the property, held a second mortgage to secure a loan. On June 4, 1990, Debtor filed a voluntary petition in bankruptcy under Chapter 11. The only asset of the bankruptcy was that property.

On February 4, 1991, Home Life filed a motion for relief from automatic stay in order to pursue its state remedies and Debtor objected. Four days later, Debtor applied to the court for the authority to hire real estate brokers in an attempt to sell the property privately. It was Debtor's belief that it would receive more money from a private sale than from a foreclosure sale. Both secured parties were aware of Debtor's motion but neither filed objections.

On March 1, 1991, Debtor and Home Life entered into a stipulation whereby Home Life agreed to a 60–90 day period during which time Debtor could attempt to find a purchaser, subject to the bankruptcy court's approval. In return, Home Life was provided relief from the stay and could pursue its rights as the primary secured party once the time period had expired.

On March 19, 1991, Daniel filed a motion for relief from the automatic stay in order to resume foreclosure proceedings in state court. The bankruptcy court granted Debtor's request to retain real estate brokers, at which time debtor hired Corson & Buckey, a real estate broker licensed in Ohio, and AMCI, the original manager of the apartments and a real estate broker licensed in Missouri. Pursuant to the listing contract, the brokers would receive a commission when they procured a purchaser "ready, willing and able to purchase ... for any price acceptable to the Owner."

On April 30, 1991, the court granted Daniel's motion for relief from automatic stay. As a result of the broker's efforts, on May 7, 1991, Andrew Green signed an offer to purchase the property for $1,450,000. Debtor accepted the offer and on May 28, 1991, filed a motion with the bankruptcy court to sell the property to Green. Daniel received notice of the proposed sale on June 10, 1991. One day later, Daniel filed an objection to the sale, disclosing for the first time that on April 30, 1991, Home Life had assigned to him its interest in the property. This allowed Daniel to bid the amount of the secured debt without having to produce any cash.

At a hearing regarding Debtor's motion to sell the property to Green, Daniel bid $1,451,000 on the property. In light of the higher amount offered by Daniel, the court awarded the property to Daniel. Daniel then disposed of the property at foreclosure, submitting the winning bid of $1.5 million.

After completion of the sale, the brokers sought payment of their commission from the sale proceeds. Daniel, however, refused to

* The Honorable Wendell A. Miles, United States District Judge for the Western District of Michi- gan, sitting by designation.

pay. After a hearing on the matter, the bankruptcy court awarded the brokers the requested commission. The district court affirmed.

## II.

In bankruptcy, the district court acts as an appellate tribunal, and this court, in turn, reviews the district court's decision on appeal. 28 U.S.C. § 158. We will not set aside a bankruptcy court's findings of fact unless clearly erroneous. *In re Ward,* 857 F.2d 1082, 1083 (6th Cir.1988). That is, we will reverse only when this court, upon review of the evidence, "is left with a firm and definite conviction that a mistake has been committed." *In re Senior-G & A Operating Co., Inc.,* 957 F.2d 1290, 1295 (5th Cir.1992). We review the bankruptcy court's conclusions of law, however, *de novo. In re Batie,* 995 F.2d 85, 88 (6th Cir.1993).

### A) State Law Issues.

Daniel contends that as a matter of Ohio law, the brokers were not entitled to their commission. In support, he makes three arguments. First, he contends that the brokers are not entitled to the commission as they failed to "procure" the highest bid on the property. Ohio courts follow the rule that the terms of a brokerage contract govern when a broker is entitled to his commission. *See Wertz Realty, Inc. v. Parden,* 79 Ohio App.3d 461, 607 N.E.2d 550, 552 (1992); *Lentz v. Schnippel,* 71 Ohio App.3d 206, 593 N.E.2d 341, 344–45 (1991); *Century 21 Apex Realty v. Haddad,* 67 Ohio App.3d 155, 586 N.E.2d 215, 217 (1990). Normally this means that a broker is entitled to his commission once he has produced a "ready, willing and able purchaser" of the property, *Lentz,* 593 N.E.2d at 344, or procured a valid contract for sale. *Parden,* 607 N.E.2d at 551. Thus, a broker need "procure" the actual purchaser of the property only when the contract terms so require. In the present case, AMCI and Corson & Buckey were required only to produce a willing and able purchaser of the property at a price term satisfactory to Debtor. The brokers fulfilled this obligation when Green signed, and the debtor accepted, a contract to purchase the

property at $1.45 million. Daniel's first claim of error, therefore, fails.

Second, Daniel argues the brokers are not entitled to the commission because the bankruptcy court never approved the sale, as Daniel outbid Green for the property. We disagree. As an initial matter, whether a broker is owed a commission depends on whether the broker satisfied the terms of the contract, not whether the transaction was actually completed, unless the contract so requires. *Lentz,* 593 N.E.2d at 344. Furthermore, Ohio courts recognize that "[a] broker should not be denied his rightful commission where the parties have signed a purchase contract and the failure to complete the purchase is attributable to one of the principals to the purchase." *Id.* at 345 (quoting *Ferguson Realtors v. Butts,* 37 Ohio App.3d 30, 523 N.E.2d 534, 539–40 (1987)). Likewise, the brokers of the present case should not be denied their commission when Daniel, the successor to the party that consented to Debtor's hiring the brokers, brought about the demise of the private sale.

Finally, Daniel argues that the bankruptcy court violated the terms of Ohio Revised Code § 4735.20 by awarding the commission, in part, to AMCI, a foreign-licensed broker. Section 4735.20 provides in part:

> No licensed real estate broker or licensed foreign real estate dealer shall pay a commission for performing any of the acts specified in section 4735.01 [the definitional section] of the Revised Code to any person who is not a licensed foreign real estate dealer or a licensed foreign real estate salesman or to any person who is not a licensed foreign real estate dealer or a licensed foreign real estate salesman....

Daniel contends that this provision precludes Corson & Buckey from sharing the commission with AMCI. We disagree with Daniel's interpretation. Section 4735.20 clearly provides that it prohibits only the payment of a commission to any broker not holding a license of *any state.* As long as the broker holds a license of some state, the broker may accept payment of the commission. Indeed, § 4735.20 specifically provides that "[a] licensed foreign real estate dealer of another

state may receive a commission from a licensed real estate broker or licensed foreign real estate dealer of another state." *Id.* As AMCI is licensed in Missouri, § 4735.20 does not prohibit it from receiving part of Corson & Buckey's commission.

### B) 11 U.S.C. §§ 503(b)(1)(A) and 506(c).

The bankruptcy court approved the payment of the brokers' commission as an administrative expense after determining that: 1) the brokers had completed performance under the brokerage contract; and 2) Daniel, as successor-in-interest to Home Life, had "acquiesced" to the use of the brokers. Daniel contends that the lower courts erred in determining that the commission was a legitimate administrative expense under § 503(b)(1)(A) and in failing to discuss the requirements of § 506(c) prior to awarding the commission.

Section 503(b)(1)(A) provides for the payment of "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after commencement of the case." Daniel contends that the district court erred in concluding that § 503 authorized the payment of the commission since the bankruptcy court had not approved the sale to Green and, therefore, the brokers had not produced a willing and able purchaser. As this is the same argument discussed in section II(A) of this opinion, this claim of error fails.

As to Daniel's second argument, § 506(c) provides:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

11 U.S.C. § 506(c). As a general rule, in order to prevail on a § 506(c) claim, the claimant bears the burden of proving that the costs were reasonable, necessary, and a benefit to the secured party. *In re Daily Medical Equipment, Inc.*, 150 B.R. 205, 208 (Bankr.N.D.Ohio 1992). In the alternative, recovery may be had where the claimant establishes that the secured party directly or impliedly consented or caused the expense.

*In re Swann,* 149 B.R. 137, 143 (Bankr. D.S.D.1993) (citing *Matter of Great Northern Forest Products, Inc.,* 135 B.R. 46, 62 (Bankr.W.D.Mich.1991)); *In re Staunton Indus., Inc.,* 75 B.R. 699, 702 (Bankr.E.D.Mich. 1987). Both the bankruptcy court and the district court determined that Daniel, by virtue of his status as successor-in-interest to Home Life, acquiesced or consented to the broker expense. For the reasons stated herein, we agree with this conclusion.

While a court may imply a secured party's consent from the circumstances of a case, *In re Staunton Indus.,* 75 B.R. at 702, a finding of consent "is not to be lightly inferred." *In re Flagstaff Foodservice Corp.,* 739 F.2d 73, 77 (2d Cir.1984); *In re Williamson,* 94 B.R. 958, 964 (Bankr.S.D.Ohio 1988). Furthermore, consent should not be inferred merely from the fact that the secured party cooperated with the debtor. *Flagstaff,* 739 F.2d at 77. Daniel did more than merely "cooperate" with the sale, however. Home Life, as first secured creditor, stipulated in writing to Debtor's right to pursue a private sale for a limited amount of time. In return, Debtor agreed to lift the automatic stay against Home Life. Daniel, as successor-in-interest to Home Life, is therefore bound by Home Life's consent. Furthermore, Daniel failed to object to Debtor's retention of the real estate brokers until the brokers had performed under the contract. Given this acquiescence, we will not allow Daniel to defeat the Debtor's and brokers' legitimate expectations.

Daniel makes the alternative argument that Home Life's consent was ineffective as it consented only after making a motion for relief from the automatic stay. Daniel waived this argument by failing to present it to either the bankruptcy or district court. Even if the argument were not waived, however, it fails, as the cases Daniel cites in support of his position all involve a creditor's acquiescence to expenses while still under automatic stay. *See In re Williamson,* 94 B.R. at 965 n. 7; *Brookfield Prod. Credit Ass'n v. Borron,* 36 B.R. 445, 449 (E.D.Mo.1983), *aff'd,* 738 F.2d 951 (8th Cir. 1984). In contrast, Home Life consented to Debtor's retention of the brokers in consider-

ation for, and simultaneously with, Debtor's agreeing to lift the automatic stay. Hence, the facts of the present case are sufficiently distinguishable from those of the cases cited by Daniel.

As we hold that Daniel, as successor-in-interest to Home Life, consented to the retention of the brokers, we find it unnecessary to determine whether the commission was necessary, reasonable and beneficial to Daniel. The commission is a proper administrative expense under §§ 503(b)(1)(A) and 506(c).

**AFFIRMED.**

MILES, District Judge, dissenting.

Although I agree with the majority's conclusion that the brokers were contractually entitled to a commission under the requirements of Ohio law, I must disagree with the conclusion that the bankruptcy court properly allowed payment of the commission as an administrative expense.

The majority appears to consider the March 1, 1991 stipulation between the debtor in possession and Home Life to be key to this case, for in this stipulation—according to the majority—"Home Life, as first secured creditor, stipulated in writing to Debtor's right to pursue a private sale for a limited amount of time." If Home Life had in fact so stipulated, I would have no trouble concluding that Daniel, as successor-in-interest to Home Life, was bound by it. However, the stipulation contains no express consent to a private sale, and its rather careful wording affords little basis for inferring consent.

The March 1, 1991 stipulation recites a "Background" of the following facts: that Home Life wished to terminate AMCI as the manager of the property and hire a replacement firm to manage it; that there was no equity in the property; that the debtor in possession had no intention to reorganize; and that the debtor in possession wished to

have a reasonable time in which to expose the property for sale. The pertinent terms of the actual stipulation read as follows:

1. Subject to the terms of Paragraph 2 herein, Debtor agrees that the automatic stay of § 362 may be and hereby is lifted as to Lender and that Lender may exercise all its rights and remedies with respect to the Property as permitted by any agreements or documents that pertain or relate to the Property as well as the Uniform Commercial Code and any other applicable non-bankruptcy law.

2. Pursuant to agreement between Debtor and Lender, Lender has the right to seek the appointment of a receiver for the Property. Debtor does not and will not object to the implementation of that remedy by Lender after May 1, 1991 and Lender agrees not seek [sic] to replace AMCI as manager of the Property prior to May 1, 1991 without further Order of this Court based on a change of circumstances.

Therefore, the stipulation, which the bankruptcy court approved, expressly allowed Home Life to immediately pursue its non-bankruptcy remedies—with the exception of seeking the appointment of a receiver for the property. Home Life did not agree to the retention of the brokers in consideration for the debtor in possession's agreement to lift the automatic stay; instead, Home Life simply agreed to temporarily halt efforts to displace AMCI as the property's manager.[1]

Both Home Life and Daniel sought relief from the automatic stay in order to pursue their state court remedies. Daniel's own March 19, 1991 motion for relief from the automatic stay, which the bankruptcy court granted, recited that Home Life had already commenced foreclosure proceedings in state court. Where the creditor moves to lift the automatic stay, it is particularly inappropriate to view the creditor as having consented to the administrative expenses. *Noland v. Williamson (In re Williamson)*, 94 B.R. 958,

---

1. Perhaps even more troubling than the bankruptcy court's erroneous inference of consent is its failure to consider Daniel's argument that AMCI, which managed the apartment complex for the debtor in possession and which sought to share in the commission, had allowed the property to deteriorate under its care. For reasons which are unclear, the bankruptcy court considered the issue of deterioration to be irrelevant. However, in my view, both the bankruptcy court and the district court erred in failing to consider whether AMCI was responsible for any deterioration, and, if so, whether the deterioration negatively affected the value of the property.

965 (Bankr.S.D.Ohio 1988); *Brookfield Prod. Credit Ass'n v. Borron*, 36 B.R. 445, 448 (E.D.Mo.1983), *aff'd*, 738 F.2d 951 (8th Cir. 1984). Under the circumstances, I fail to see how either Home Life or its assignee Daniel could be deemed to have even impliedly consented to the payment of the brokers' commission. Moreover, because the bankruptcy court made no finding that the brokers' services were of primary benefit to Daniel, this alternative basis for charging him with the expense also fails.

Because I would reverse the allowance of the brokers' commission as an administrative expense to be paid from the proceeds of the secured collateral, I respectfully dissent.