United States Bankruptcy Appellate Panel

FOR THE EIGHTH CIRCUIT

---

No. 97-6014NE

---

In re:                          *
                                *
Edward James Kula,              *
                                *
        Debtor                  *
-------------------------------------------------------
Eugene Chamberlain,             *
                                *
        Trustee - Appellant,    *    Appeal from the United
v.                              *    States Bankruptcy Court
                                *    for  the  District  of
Nebraska
Edward James Kula,              *
                                *
        Debtor - Appellee,      *
                                *
Community First State Bank,     *
f/k/a The Abbott Banks,         *
                                *
        Creditor - Appellee*

---

Submitted: September 18, 1997
        Filed: October 31, 1997

---

Before KOGER, WILLIAM A. HILL and DREHER, Bankruptcy
Judges

KOGER, Chief Bankruptcy Judge

Eugene Chamberlain ("Chamberlain") appeals the decision by the bankruptcy court in which Chamberlain was ordered to disgorge a portion of the interim fees he had received as the "liquidating agent" under a confirmed Chapter 11 liquidating plan. Although the order finally allowed Chamberlain $46,450.11 in fees and expenses, Chamberlain appeals the order because, not only was it less than he had requested, it was $26,646.87 less than had already been paid on an interim basis. Appellee, Community First State Bank, f/k/a/ Guardian State Bank ("Community First State Bank"), is the debtor's largest unsecured creditor, holding a claim of just under $500,000 which represents about 90% of the total unsecured claims. The debtor, Edward James Kula ("Kula"), filed a "letter brief" but did not address the issue of Chamberlain's fees.

We have jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(b) and (c).

FACTS

Kula filed his Chapter 11 petition in 1986. Prior to the Chapter 11 plan being confirmed, Chamberlain had acted as examiner in this case and was compensated for his services in that regard. That compensation is not a subject in this appeal. The Chapter 11 plan, a creditor's liquidating plan, was confirmed in February,

2

1987, wherein Chamberlain was appointed as a liquidating agent with "all of the rights and powers of an examiner under Chapter 11 of the Bankruptcy Code, and all of the rights and powers of a trustee under Title 11, United States Code, pursuant to the authority of 11 U.S.C. section 1106(b)."  The plan provided for Chamberlain to manage Kula's

farm and ranch on an interim basis during the liquidation and to sell Kula's assets as necessary to pay the allowed claims. The plan of liquidation did not address Chamberlain's compensation for his role in liquidating the estate.

For the first few months following Chamberlain's appointment under the plan, Kula and Community First State Bank were negotiating a possible restructuring on loans which would have allowed Kula to dismiss the bankruptcy, so Chamberlain did not conduct an inventory or begin his liquidation at that time. In June of 1987, however, Kula was voluntarily admitted to a hospital for treatment of a mental problem. At that time, Chamberlain assumed control of Kula's farming and ranching operations, and, although Kula was released from the hospital in late August, 1987, Chamberlain remained in control of the management of the farming and ranching operations throughout the rest of the bankruptcy case. In addition, while Kula was in the hospital, Chamberlain began to undertake the liquidation of Kula's assets. Although he had not yet taken an inventory of the contents of Kula's two residences, Chamberlain authorized two or three of Kula's "friends" to enter Kula's residences for the purpose of removing all of Kula's personal property worth $200.00 or less per item. These items were to be kept for Kula and his children as "exemptions." Anything thought to be worth more than

4

$200.00 was to be stored until it could be sold at auction. Beginning in September, 1987, when the first auction of Kula's personal property was conducted, and throughout the ensuing liquidation process, Kula alleged that Chamberlain was improperly administering and liquidating the estate in several respects. Chamberlain responded to the allegations with general denials.

After Chamberlain filed his Final Report on August 3, 1990, Kula objected, again alleging wrongdoing on Chamberlain's part, including that Chamberlain had not accounted for some of the property of the estate, that some of his property had been unlawfully taken, that Chamberlain had failed to pursue claims of the estate, and that redundant payments were made to certain creditors. Chamberlain continued to deny all of Kula's allegations, and pursuant to court order, filed an Amended Final Report which was again objected to by Kula. The bankruptcy court tried three times to schedule a trial on the Amended Final Report and Kula's objections, but ultimately concluded that Kula was not competent to try the case. As a result, the bankruptcy court decided it was in the best interest of the bankruptcy estate to appoint an independent third party to investigate Kula's allegations and to report his findings to the court.

Thus, on July 29, 1994, pursuant to § 105, the bankruptcy court appointed an independent examiner, Michael Snyder, to investigate Chamberlain's administration and liquidation of the estate. Among other things, Snyder was particularly directed to investigate the existence and whereabouts of certain substantial items of personal property which Kula had maintained were "stolen" from him while he was in the hospital in the Summer of 1987. Specifically, Kula alleged certain people had taken, among other things, a

6

saddle and spur collection, a china and porcelain collection, pianos, an antique pipe organ, a diamond ring, vehicles, horses, cattle, farm equipment, and cash which he had hidden in his residences.

Snyder conducted a thorough investigation and submitted his conclusions (a report and supplemental report which were filed with the court in November and

December, 1994) which mentioned several irregularities in regard to Kula's property. Although Snyder was able to uncover little hard evidence as to exactly what property was taken and by whom, he was convinced that many of Kula's allegations were well-founded and that property of substantial value had been taken prior to Chamberlain's inventory of the personal property. For example, Snyder was convinced that prior to Kula's June, 1987 hospitalization, he had a china collection valued at $100,000 to $200,000. By the time Chamberlain conducted his inventory of the personal property, which was after he authorized its removal, the entire collection was missing. As a result, and because Kula did not list any valuable property in his schedules nor did he mention it at the § 341 meeting, Chamberlain did not even know these items had existed.[1]

Snyder noted concern that Chamberlain waited some five months after he was appointed in February of 1987 before he actually took possession of the assets in June of 1987 and emphasized the fact that Chamberlain had not inventoried the contents of Kula's residences prior to authorizing the removal of personal property items. The examiner further commented that the events alleged by

---

[1] The reports filed by Snyder indicated that Kula himself may have been involved in the disappearance of some of the property. Although Chamberlain points this out on several occasions, as discussed below, the issues regarding what happened to the missing property are not relevant in this appeal.

Kula, in large part, took place between February, 1987 and August, 1987, the period of time between Chamberlain's appointment and the inventory of the assets.

Based on Snyder's conclusions, the court ordered Kula to file a list of all the property he believed constituted property of the estate as of the date the plan was

confirmed. Chamberlain was then to declare his intention as to each of those items. Although Kula failed to file such a list, Chamberlain responded to the court's order by filing a motion to abandon all of the property that had not been administered (which would include the allegedly missing property). Because there were no objections to Chamberlain's motion to abandon the property, the court granted the motion. Chamberlain made no effort to recover the missing property or to identify who had taken it; rather, he simply abandoned it because he thought that any effort to recover the missing property would not be cost-efficient or would be entirely futile. Meanwhile, Chamberlain tried three times to close the case, but because of the irregularities, the case could not be closed.

Chamberlain eventually filed an Application for Final Compensation, requesting fees in the total amount of $89,673.75, of which he had already received interim compensation in the amount of $73,096.98. The bankruptcy court issued an order dated January 31, 1997, in which it concluded that some of the fees requested by Chamberlain were duplicative, that there was a factual basis for some of Kula's allegations, and that due to Chamberlain's inability or failure to respond to Kula's allegations, some of the fees were excessive. Therefore, the court disallowed some of the requested fees and ordered Chamberlain to disgorge the excess interim fees paid.

In calculating the appropriate compensation in its January 31, 1997 order, the court distinguished between services provided before and after the filing of Chamberlain's First Final Report on August 8, 1990, because by that date, the assets of the bankruptcy estate had already been fully administered by Chamberlain. The court noted that Chamberlain claimed he had worked some 498 hours between plan

11

confirmation and the final report and he had worked 386.28 hours after he filed his final report.

As to the charges billed for the period before the final report, Chamberlain's billings included commissions of $28,523.71 and fees and expenses of $33,471.73, for a total of $61,995.45.  The bankruptcy court concluded that this figure was unreasonable because it involved duplicative charges in that it was not appropriate for Chamberlain to be paid both a commission and an hourly rate for services performed.  A trustee, the court noted, would not have been entitled to an hourly rate in addition to the percentage fee, so the court disallowed the commissions as duplicative.  Without taking account of the number of hours or the rate charged, the court then found that balance, $33,471.73, was appropriate and customary compensation for a similarly complex case.

As to the charges incurred after the final report, Chamberlain sought $27,678.30 in fees, expenses, and commissions, of which $11,101.53 had already been paid. After again disallowing the commissions (in the amount of $586.92) as duplicative, the court noted that most of the services provided by Chamberlain after August 8, 1990 were related to the allegations made by Kula.  Thus, the court found they were of almost no measurable benefit to the bankruptcy estate because they did not in any way enhance the property of the bankruptcy estate and the

12

services did not lead to an orderly and timely closing of the bankruptcy case. The court noted that the problems in this regard could have been disposed of very easily had Chamberlain taken an inventory of the estate assets upon confirmation of the plan. The court referred to Chamberlain's failure to conduct the initial inventory as "a significant omission" and noted that

because he failed to take the inventory, it was difficult, if not impossible, for Chamberlain to meet Kula's allegations with any evidence. The court also noted that because of this failure, it was necessary to hire the third party examiner, Snyder, which cost the estate some $17,000. Again, without making a lodestar calculation, the court concluded that Chamberlain's reasonable compensation for this time period was $10,000 for services and $2,978.38 for expenses.

The net result was that Chamberlain was allowed a total of $46,450.11 in fees and expenses. Since he had already been paid $ 73,096.98, he was required to disgorge $26,646.87. Chamberlain appeals that order.

ARGUMENTS

Chamberlain raises five points on appeal which may all be disposed in a discussion of his two primary arguments, namely, (1) the court did not apply the proper standard in determining the appropriate award of compensation; and (2) Chamberlain was entitled to a hearing so as to present live testimony on the disputed factual issues. With one exception, we find no error in the bankruptcy court's factual findings or conclusions of law; however, for the reasons that follow, we conclude that the case must be reversed and remanded for either a

14

lodestar calculation or a finding that the lodestar method is not appropriate under the circumstances.

## STANDARD OF REVIEW

An appellate court reviews the bankruptcy court's findings of fact, whether based upon oral or documentary evidence, for clear error, and reviews legal conclusions de novo. Fed. R. Bankr. P. 8013; First National Bank of Olathe v. Pontow, 111 F.3d 604, 609 (8th Cir. 1997). We review the bankruptcy court's decisions regarding an award of fees under an abuse of discretion standard. Grunewaldt v. Mutual Life Ins. Co. (In re Coones Ranch, Inc.), 7 F.3d 740, 744 (8th Cir. 1993). An abuse of discretion occurs in this context "if the bankruptcy judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous." Agate Holdings, Inc. v. Ceresota Mill L.P. (In re Ceresota Mill L.P.), 215 B.R. 315 (8th Cir. BAP, August 15, 1997). To be clearly erroneous, after reviewing the record, we must be left with the definite and firm impression that a mistake has been committed. In re Waugh, 95 F.3d 706, 711 (8th Cir. 1996). "Whether the compensation sought is reasonable, given the time, nature, extent of the services and the value of the services is always a question of fact for the court." In re Jelinek, 153 B.R. 279, 284 (Bankr. D. N.D. 1993). Furthermore, review is limited in deference to the bankruptcy judge's familiarity with the work performed by

16

the professional.  <u>In re Grady</u>, 618 F.2d 19, 20 (8th Cir. 1980).[2]

<hr />

[2] Although the parties appear to distinguish the clearly erroneous standard and the abuse of discretion standard, the Supreme Court has held that they are indistinguishable. <u>See</u> <u>Cooter & Gell v. Hartmarx Corp.</u>, 496 U.S. 384, 401, 110 S.Ct. 2447, 2458, 110 L.Ed.2d 359 (1990).

DISCUSSION

I. The Appropriate Method for Calculation of Fees

The bankruptcy court found that although Chamberlain was not acting in the formal capacity as bankruptcy trustee or examiner appointed under § 1104 of the Bankruptcy Code,[3] he and his attorney were professional persons within the meaning of § 327 and their compensation was to be determined under § 330 and Fed. R. Bankr. P. 2016(a).[4] The parties do not dispute this, and although § 327(f) would now make questionable Chamberlain's appointment as liquidating agent after he had already served as examiner in the case, we agree that Chamberlain's compensation, as well as that of his attorney, is determinable under § 330 and Rule 2016(a). Furthermore, although § 330 was modified in the 1994 Amendments to the Code, the bankruptcy court correctly applied the previous version because the Amendments are applicable only to those cases commenced on or after October 22, 1994.

Section 330(a), as applicable to this case, allows the court to award to a professional person:

---

[3] Hereafter, all statutory references are to the United States Bankruptcy Code, 11 U.S.C. §§ 101 through 1330.

[4] Chamberlain's attorney was also allowed fees and expenses in the total amount of $64,961.68. That award is not challenged in this appeal.

(1) reasonable compensation for actual, necessary services rendered . . . based on the nature, extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a). Section 330 applies to all bankruptcy cases, including Chapter 11 cases. See In re Reed, 890 F.2d 104, 105 (8th Cir. 1989) (finding no merit to suggestion that a distinction be drawn between fee applications in Chapter 7 and Chapter 11 cases); In re Malewicki, 142 B.R. 353, 356 (Bankr. D. Neb. 1992). Chamberlain bore the burden of proving he is entitled to compensation. See In re Land, 138 B.R. 66, 70 (D. Neb. 1992).

In calculating the appropriate compensation, the Eighth Circuit announced in In re Apex Oil that "the lodestar approach, including the possibility of adjustments in rare and exceptional circumstances, is an appropriate method to use in calculating reasonable compensation under § 330." P.A. Novelly v. Palans (In re Apex Oil Co.), 960 F.2d 728, 731 (8th Cir. 1992). The lodestar method is calculated as the number of hours reasonably expended multiplied by a reasonable hourly rate. Id. at 731.

As discussed more fully below, the bankruptcy court in the case at bar referred to the lodestar method for calculating professional fee awards, but it did not expressly make a lodestar calculation in arriving at its award. Although the language used by the Eighth Circuit Court of Appeals in In re Apex Oil does not appear to *require* an express lodestar calculation, it clearly

20

indicates that the lodestar method is the preferred method for calculating fees.  As a result, we conclude that in making professional fee awards, bankruptcy courts must *either* make an express lodestar calculation *or* make a finding that the lodestar method is inappropriate under the circumstances.

The Supreme Court has made it clear that the lodestar method of fee calculation is the preferred method by which federal courts should determine reasonable attorney's

fees under federal statutes which provide for such fees. See In re Boddy, 950 F.2d 334, 337 (6th Cir. 1991) (citing Pennsylvania v. Delaware Valley Citizens Council for Clean Air, 483 U.S. 711, 107 S. Ct. 3078, 97 L.Ed.2d 585 (1987) (Delaware Valley II) (lodestar method used to calculate fees under Clear Air Act); Hensley v. Eckerhart, 461 U.S. 424, 433-34, 103 S. Ct. 1933, 1939-40, 76 L.Ed.2d 40 (1983) (lodestar method used to calculate fees in civil rights action under 42 U.S.C. § 1988)). See also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 106 S. Ct. 3088, 92 L.Ed.2d 439 (1986) (Delaware Valley I) (the Supreme Court announcing that the lodestar method, with the possibility of adjustments for factors not already factored into the lodestar amount, is appropriate); City of Burlington v. Dague, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (lodestar method appropriate under Solid Waste Disposal Act).

Similarly, the Eighth Circuit has held in other non-bankruptcy cases that where a statute provides for "reasonable" attorney fees, as does this statute, the lodestar method is the preferred method by which to calculate the reasonable fees. See e.g., Pinkham v. Camex, Inc., 84 F.3d 292, 294 (8th Cir. 1996) (holding that the lodestar method is the appropriate method for calculating "reasonable" attorney fees allowed under the copyright statute); Newhouse v. McCormick & Co., 110 F.3d

22

635, 644 (8th Cir. 1997) (applying lodestar method under the Age Discrimination in Employment Act fee shifting statute); <u>Kientzy v. McDonnell Douglas Corp.</u>, 990 F.2d 1051, 1063 (8th Cir. 1993) (applying lodestar method in sex discrimination case).

Likewise, we believe that a lodestar calculation is a necessary starting point for determining fee awards under § 330. If there is no explanation as to how the court

calculated the amount of the award, a reviewing court is unable to assess the propriety of a fee award on appeal. Without at least some discussion of the lodestar factors, the award of the bankruptcy court becomes arbitrary and unreviewable. See In re Boddy, 950 F.2d at 338 (citing In re Evangeline Refining Co., 890 F.2d 1312, 1328 (5th Cir. 1989)). Thus, we find that unless such a calculation is inappropriate under the circumstances, a bankruptcy court must, at a minimum, specifically calculate the lodestar amount when it determines the appropriate fee to be awarded to a professional person under § 330. Accord In re Boddy, 950 F.2d at 337-38 (the Sixth Circuit holding that the bankruptcy court must expressly calculate the lodestar amount when determining reasonable attorney fees); In re Malewicki, 142 B.R. at 356. We would comment, however, that some cases, particularly Chapter 13 cases, are not prone to a lodestar calculation.[5] In

---

[5] Because the majority of work in most Chapter 13 cases is normal and customary, and because of the sheer volume of such cases in most districts, the lodestar calculation may not necessarily be the best method for determining appropriate fees in those cases. Accord In re Watkins, 189 B.R. 823, 828-29 (Bankr. N.D. Ala. 1995); In re Dubin Paper Co., 169 B.R. 115, 121 (Bankr. E.D. Pa. 1994); In re Busy Beaver Bldg. Ctrs., 19 F.3d 833, 856 (3rd Cir. 1994) (section 330 does not ossify the lodestar method as the point of departure in fee determinations); In re Atwell, 148 B.R. 483, 487-88 (Bankr. W.D. Ky. 1993) (announcing that in Chapter 13 cases after Boddy, if counsel chose to receive a flat fee of $875.00 or less, the lodestar method would not be applied and counsel would not be required to submit detailed bulling application; however, if the attorney chose to represent the client on an hourly basis, the lodestar method would be applied). In such cases, a court would merely be required to make a finding that a method other than the lodestar method, such as the "normal and

such cases, a lodestar calculation is not required; however, the

---

customary" debt-based formula, is more appropriate for determining the fee award.

In addition, many districts have local rules which provide that if the applicant's fee is under a certain amount, usually about $1,000, no itemized statement is necessary. See e.g., Local Rule of Practice for the United States Bankruptcy Court for the Western District of Missouri 2016-1.B (providing that if counsel's total fee in a case is $1,000 or less, the disclosure of the fee in initial filings is sufficient and it is unnecessary to file any itemized application).

court should make a finding that such a calculation is inappropriate under the circumstances.

As a result, unless such a calculation would be inappropriate under the circumstances, the bankruptcy court must make a finding as to whether the number of hours billed were reasonable in light of the complexity of the case, and then multiply that by a reasonable hourly rate for those services. The party seeking an award of fees should submit evidence supporting the hours worked and the rates claimed. See Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S. Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (holding that the starting point in determining the amount of reasonable fees under civil rights statutes was a lodestar calculation which provides an objective basis on which to make an initial estimate of the value of a lawyer's services). If the hours or the rate requested by the professional is not reasonable under the circumstances for the work performed, the bankruptcy court should make such a finding.

Once the lodestar amount has been calculated, that amount is presumed to be reasonable compensation under § 330. See In re Manoa Fin. Co., 853 F.2d 687, 691 (9th Cir. 1988). However, using the lodestar amount as a start, the Eighth Circuit has held that adjustments may be made to that amount under certain circumstances. Because the lodestar amount presumably reflects (1) the

26

novelty and complexity of the issues, (2) the special skill and experience of counsel; (3) the quality of representation, and (4) the results obtained, these factors normally cannot serve as independent bases for increasing the fee award above the lodestar amount. <u>See In re Apex Oil</u>, 960 F.2d

at 731-32. Nevertheless, adjustments to the lodestar amount may be made in rare and exceptional circumstances based on the quality of the representation or the results obtained. Id. at 732 (citing Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986) (Delaware Valley I)). Such a finding by the bankruptcy court must be supported by both specific evidence on the record and detailed findings by the bankruptcy court. Id. As the Eighth Circuit elaborated:

> Because the lodestar amount may already compensate the applicant for exceptionally good service and results, however, the fee applicant must do more than establish outstanding service and results. The applicant also must establish that the quality of service rendered and the results obtained were superior to what one reasonably should expect in light of the hourly rates charged and the number of hours expended. See [Blum v. Stenson, 465 U.S. 886, 899, 104 S.Ct. 1541, 1549 (1984)]; Copeland v. Marshall, 641 F.2d 880, 893-94 (D.C. Cir. 1980) ("A quality adjustment is appropriate only when the representation is unusually good or bad, *taking into account the level of skill normally expected* of an attorney commanding the hourly rate used to compute the 'lodestar.'" (emphasis in original).

Id.

Beyond this, it is not clear as to what types of factors the bankruptcy court can consider in determining

28

whether an adjustment to the lodestar amount is appropriate. The Eighth Circuit in fact stated in <u>In re Apex Oil</u> that it was not attempting to give a comprehensive answer to the question as to what an applicant must show to establish that rare and exceptional circumstances exist to justify a fee enhancement; rather, it merely answered the question as to whether and when the quality of representation or

the results obtained can constitute a basis for fee enhancement.  Id.  Many courts, including the bankruptcy court in this case, have applied the standards set forth in Johnson v. Georgia Highway Exp., Inc., 488 F.2d 714, 717-19 (5th Cir. 1974), to determine what constitutes reasonable compensation under the circumstances.  See In re Malewicki, 142 B.R. at 355 (citing In re McCombs, 751 F.2d 286 (8th Cir. 1984), and Bess v. Bess, 929 F.2d 1332, 1335 n.6 (8th Cir. 1991)).  The Johnson factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  Id.

Of course, as the Eighth Circuit said, several of these factors have already been taken into account under the lodestar calculation, so they should not form the basis for an adjustment to that amount, unless it is shown by specific evidence that they are not fully reflected in the lodestar.  See also Delaware Valley I,

478 U.S. at 564-65, 106 S.Ct. at 3098 (repeating its conclusion that the <u>Johnson</u> factors are, for the most part, already reflected in the lodestar amount, but that adjustments may be made in rare and exceptional cases); <u>In re Manoa Fin. Co.</u>, 853 F.2d at 687.

In any event, we find that the <u>Johnson</u> factors may be considered in adjustments to the lodestar amount to the extent that they are not already factored into that amount.

It should be remembered, however, that the lodestar amount is presumed to be reasonable, and that adjustments should be made only in rare and exceptional circumstances as defined by the Eighth Circuit in In re Apex Oil. Accord Delaware Valley I, 408 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439.[6]

Finally, it has also been said that bankruptcy courts should award fees commensurate with fees allowed in other areas of practice, thus providing counsel economic incentive to provide services in bankruptcy cases. In re McCombs, 751 F.2d 286, 288 (8th Cir. 1984); In re Malewicki, 142 B.R. at 357. On the other hand, the Eighth Circuit has further held that a bankruptcy court need not find that an enhancement is necessary to make the award commensurate with compensation for comparable, non-bankruptcy services before it can enhance the

---

[6] Although not normally relevant in bankruptcy cases in terms of payment of professionals, it should be noted that the Supreme Court has further elaborated on its line of decisions as described in the Delaware Valley cases to the effect that contingency, or "risk of loss" should not form the basis for an enhancement to the lodestar calculation. City of Burlington v. Dague, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). The Eighth Circuit has recognized this: in Kientzy v. McDonnell Douglas Corp., 990 F.2d 1051 (8th Cir. 1993), the Eighth Circuit reversed the lower court's contingency enhancement and remanded the case for a determination as to whether the lodestar amount adequately reflected the difficulty of establishing the merits of the case. See also Newhouse v. McCormick & Co., 110 F.3d 635, 644 (8th Cir. 1997) (holding Dague applies with full force to the ADEA fee shifting statute thus prohibiting a fee enhancement beyond the lodestar amount on the basis of a contingency arrangement).

applicant's fee.  <u>In re Apex Oil</u>, 960 F.2d at 732. Rather than requiring such a finding, § 330 provides that "the cost of comparable services" in non-bankruptcy cases is one of a number of factors to consider in calculating "reasonable compensation."  <u>Id</u>. at 732-33.

In sum, we hold that in calculating an applicant's "reasonable fee" under § 330, unless the bankruptcy court makes a specific finding that the lodestar method is not appropriate under the circumstances, the bankruptcy court must start with the lodestar calculation as described above. The bankruptcy court may then make adjustments to the lodestar amount, in rare and exceptional circumstances, to reflect that the quality of service rendered and the results obtained were superior or inferior to what one reasonably should expect in light of the hourly rates charged and the number of hours expended. Certain other factors, such as the Johnson factors and the cost of comparable services in non-bankruptcy cases, may also be considered to the extent they are not already factored into the lodestar calculation. The bankruptcy court's decisions must be supported by evidence and the bankruptcy court should issue findings and conclusions which will allow a reviewing court to determine whether the amount awarded was reasonable under the guidelines.

Applying these principles to the case at bar, we conclude, for the reasons that follow, that the case must be remanded to the bankruptcy court for further findings.

A. Calculation of Fees for the Period Before August 8, 1990

As to the reduction for the fees billed prior to the August 8, 1990 report, the bankruptcy court simply found that the total of "$61,995.45, including as it does both commissions of $28,523.72 and fees and expenses of $33,471.73, was unreasonable compensation -- not because the hours worked were misstated or the hourly rate was too high -- but because it involved duplicative charges to the bankruptcy estate." Noting that if Chamberlain had been appointed as trustee under § 1104, he would have

been entitled to a percentage fee and no hourly fees, the court then disallowed the commissions as duplicative and found that the remaining amount (representing fees and expenses), or $33,471.73, was "within the range of customary fees for a case of this size and complexity."

In arriving at its conclusion, the bankruptcy court did not make a lodestar calculation and the Order is silent as to how the bankruptcy court arrived at the conclusion that $33,471.73 was within the customary range. "If we conclude that the bankruptcy court's findings are silent or ambiguous as to an outcome determinative factual question, we may not make our own findings but must remand the case to the bankruptcy court for the necessary factual determination." In re Apex Oil Co. 960 F.2d at 731 (quoting Wegner v. Grunewaldt, 821 F.2d 1317, 1320 (8th Cir. 1987)). Thus, because the Order is ambiguous as to how the bankruptcy court arrived at the conclusion that $33,471.73 was reasonable compensation, and particularly because the bankruptcy court did not perform a lodestar calculation, we must remand this case for those factual findings.

Moreover, Chamberlain also asserts the separate charges are not in fact duplicative because the commissions represent his work in selling the property, whereas the hourly rate (fees) and expenses represent management and administration of assets. He maintains

36

the hourly fees do not include any hours for selling property, and thus, they are separate. He further asserts he routinely charges a different rate for his recoveries and sales than he does for his management and administration of assets, and that he produced evidence that the Nebraska courts routinely grant him both types of compensation because they are separate and are not duplicative.

We have reviewed the detailed billing statements supporting the hourly fee request which were included in the record and we would comment that we found several entries which appear to be related to the sale of property. Thus, at first blush, it does not appear that the bankruptcy court was clearly erroneous in its factual finding that the charges were duplicative. However, because the bankruptcy court did not do a lodestar calculation, it did not make a finding as to the appropriate number of hours which would normally be spent on the various services performed by Chamberlain in a case similar to this one. Consequently, upon remand, the bankruptcy court is directed to make a finding, based on evidence, as to the appropriate number of hours and the reasonable hourly fee for the services Chamberlain performed prior to August 8, 1990. We would further comment that under a lodestar approach, unless the bankruptcy court made a determination that commissions would be particularly appropriate under the circumstances, such a form of separate compensation for sales would not be appropriate. Instead, an hourly rate should be assigned to those services. Whether the hourly rate for those services should be the same as for managerial and administrative services is a question of fact for the bankruptcy court and the applicant should present evidence on those factual issues.

38

In any event, the case must be remanded so that the bankruptcy court can do a specific lodestar calculation, determining what would be a reasonable number of hours spent performing all the work done by Chamberlain prior to August 8, 1990, and multiplying that by the reasonable or customary fee for such services.

B.   Calculation of Fees for the Period After August 8, 1990

In its calculation for the services provided after August 8, 1990, the bankruptcy court focused primarily on the fact that because Chamberlain failed to promptly inventory the assets, many of the hours spent after August 8, 1990, were unnecessary and did not benefit the estate and that that factor "weigh[ed] heavily against the allowance of the very substantial fees and reimbursement of expenses requested by the applicants." By submitting the First Final Report on August 8, 1990, Chamberlain was claiming the estate had basically been fully administered at that time. The bankruptcy court thus noted that a significant amount of the post-August 8, 1990 billings were attributable to responding to Kula's allegations.   Essentially, the court concluded that much of this effort would have been avoided if Chamberlain had properly inventoried the estate assets when the plan was confirmed rather than waiting several months to do so.  Additionally, Chamberlain himself had authorized people to remove many items during that interim period before the inventory had been taken, thus leaving room for the allegations to be brought.

The bankruptcy court, noting repeatedly Chamberlain's failure to inventory the assets at the beginning of the case, found that this was a "significant omission" and that it was "clear that the problems in this case, and

40

the problems of proof and accountability for the property of the estate could have been disposed of in a much more orderly fashion had Chamberlain taken an inventory of the assets of the bankruptcy estate upon confirmation of the plan."  The court also noted that because of this omission, Chamberlain had no evidence and that such lack of evidence made it "difficult, or almost impossible, for Chamberlain to meet the allegations of Kula."

41

The court said that the debtor tried on several occasions to get Chamberlain to respond to allegations, but that Chamberlain either would not or could not respond. Additionally, the court found that because of this omission and the fact that Chamberlain could not meet Kula's allegations, and because Chamberlain failed to look into the matters with any detail, the court was compelled to hire an independent third party to find out what had happened, and that this cost the estate $17,000 to pay the investigator. The court thus concluded that many of the hours billed by Chamberlain for those services were of no benefit to the estate and were therefore excessive.

Chamberlain claims that in arriving at its conclusion, the bankruptcy court improperly applied the lodestar method and the <u>Johnson</u> factors, particularly asserting that the bankruptcy court placed too much emphasis on the "benefit to the estate." Chamberlain asserts, "Nowhere in <u>Johnson</u> or its progeny is it stated that 'benefit of the estate' is to be the sole measuring stick for professional fees. Yet, this appears to be the only factor the bankruptcy court used in this case to approve fees."

Chamberlain's argument is flawed in two respects. First, while it is true that "benefit to the estate" is not to be the sole measuring stick for professional fees, the Eighth Circuit has held, even after its decision in

Apex Oil, that "an attorney fee application in bankruptcy will be denied to the extent the services rendered were for the benefit of the debtor and did not benefit the estate."  Keate v. Miller (In re Kohl), 95 F.3d 713, 714 (8th Cir. 1996) (quoting In re Reed, 890 F.2d 104, 106 (8th Cir. 1989) (adopting the "better rule" which requires a benefit to the estate)).  "This rule is based upon the legislative history of Bankruptcy Code section 330(a) and the unfairness of allowing the debtor to deplete the estate by pursuing its interests to the detriment of creditors."  Id. (quoting In re Hanson, 172 B.R. 67, 74 (9th Cir. BAP 1994)).  In fact, "results obtained" (which is akin to "benefit to the estate") is a factor considered under *both* the lodestar calculation and in considering an adjustment to the lodestar amount where the lodestar amount does not accurately reflect the results obtained.  In re Apex Oil, 960 F.2d at 731-32.  Thus, while Chamberlain is correct that it should not be the sole factor considered, results obtained or "benefit to the estate" is a factor which may be considered by the bankruptcy court in calculating the appropriate compensation to be awarded.

Second, while Chamberlain correctly asserts that a trustee should be compensated for activities which are necessary but do not necessarily "benefit" the estate in terms of recovery or administration, he is incorrect that the bankruptcy court failed to award him fees for

services which were necessary but not "beneficial."  In fact, the court specifically said that Chamberlain was entitled to compensation for a significant portion of the work performed after August 8, 1990, when the administration was complete, even though there was no "benefit" to the estate in terms of recovery.  The court said, referring to the period after August 8, 1990:

> A great deal of Chamberlain's services during this period of time were not of benefit to the bankruptcy estate.  However, he did, in fact, perform some services during this period of time which were reasonable and necessary and of benefit to the bankruptcy estate . . . .  The results obtained by Chamberlain by virtue of his services were of no particular benefit to the estate.  *However, as I stated, it was necessary for him to engage in some of these activities even though no benefit was expected to be obtained.*  This case really did not present any difficult questions over the period of time after the filing of the First Final Report.  If Chamberlain had made an inventory of the property in Kula's residence

> prior to disposing of it, the fees for litigating matters concerning the First Final Report would be much, much, lower than is requested in the case.

(Emphasis added.)

As this passage indicates, the bankruptcy court clearly recognized that Chamberlain should be compensated for services he performed which were necessary but were not "beneficial" to the estate. It simply concluded that the hours billed by Chamberlain were excessive in light of the services performed. We find no clear error in the bankruptcy court's conclusion that "reasonable compensation" for the services performed by Chamberlain after August 8, 1990, should not include all the hours expended in responding to Kula's allegations. Further, we see no abuse of discretion in the conclusion that those excess hours were due to Chamberlain's own failure to promptly inventory the assets. A court should exclude from the initial lodestar calculation hours that were not "reasonably expended" in the representation. See Hensley v. Eckerhart, 461 U.S. at 433, 103 S.Ct. at 1939. Finally, we reject Chamberlain's assertion that because he was required by the court to respond to Kula's allegations, he should be compensated for all of the time it took for him to respond. He was required to respond because he made the "omission" in the first place.

45

On the other hand, in arriving at its award of "reasonable compensation" for this period, the bankruptcy court simply reduced the fees for the period after August 8, 1990, to $10,000, which the court determined to be a reasonable figure.  However, the court did not expressly calculate the number of hours or the reasonable rate for the services he found were necessary.  As such, the figure of $10,000 appears arbitrary and is unreviewable. In accordance with the above discussion, therefore, upon remand, the bankruptcy court is directed to perform a specific lodestar calculation for the services

it deems necessary for the period after August 8, 1990. As described above, the "benefit to the estate" analysis performed by the bankruptcy court in arriving at the $10,000 figure can be factored into the lodestar calculation.

## II. Due Process - Entitlement to an Evidentiary Trial

Chamberlain's second point is that the bankruptcy court denied him procedural due process by failing to allow live testimony during hearings on his fee application. Citing general due process authority, the crux of Chamberlain's argument is that the debtor had accused him of certain omissions or mishandlings in his duties as liquidator, that the court based its fee reduction on those allegations, and that he should have had a more adequate opportunity to rebut those allegations.

Section 330(a) provides that the court may award fees to a professional "after notice . . . and a hearing." Section 102(1) provides that this phrase means "such opportunity for a hearing as is appropriate in the particular circumstances." As Chamberlain asserts, "if the bankruptcy court plans to disallow certain items of compensation, § 330(a) on its face first contemplates the applicant's right to a hearing." In re Busy Beaver Bldg. Centers, Inc., 19 F.3d 833, 845 (3rd Cir. 1994).

47

[I]f the court does disallow fees of a "good-faith applicant," the Code, see §§ 329(b), 330(a); see also Rule 2017(b) -- and perhaps even the dictates of due process, see U.S. CONST., amend V -- mandates that the court allow the fee applicant an opportunity, should it be requested, to present evidence or argument that the fee application meets the prerequisites for compensation; canons of fairness militate against forfeiture of the requested fees simply because the court's audit of the application uncovers some ambiguity or objection. By good-faith applicant we mean

> to refer to a fee applicant who reasonably and
> in good faith attempts to comply with the
> applicable rules governing the format and
> substance of fee applications.

Id. at 846. The court in Busy Beaver cited several cases which have held that an evidentiary hearing must be held if there are disputed issues of fact. Id. at 846, n. 16. Thus, there is no question that Chamberlain was entitled to an evidentiary hearing on his fee application. The question is, to what type of hearing was he entitled? The Busy Beaver court said:

> At the hearing, held after notice of the court's
> concerns and/or objections, the court should
> allow the applicant a reasonable opportunity to
> present legal arguments and/or evidence, as the
> case may be, to clarify or supplement the
> petition and accompanying affidavit. *Of course,
> the anatomy of the hearing lies within the sound
> discretion of the bankruptcy judge, and would
> not necessarily require the presentation of oral
> testimony.* For example, the type of hearing
> which "is appropriate in the particular
> circumstances" might simply be an oral hearing
> (whether in court or more informally, as by
> teleconference) at which the applicant submits
> argument based upon the papers. The essential
> point is that the court should give counsel a
> meaningful opportunity to be heard.

Id. (emphasis added). If after allowing the applicant to respond, the court adheres to its views and disallows some of the requested compensation, it should enter

sufficient findings of fact and conclusions of law in the record to facilitate appellate review.  <u>Id</u>. at 847.

The First Circuit has also addressed this issue.  In <u>In re Spillane</u>, 884 F.2d 642 (1st Cir. 1989), the applicant asserted that her right to cross examine the trustee's attorney was absolute and its denial was a *per se* abuse of discretion.  The First Circuit

disagreed. It said that while § 330(a) clearly requires a hearing, the statute says little about the content of that hearing. Citing § 102(1)(A), the Court concluded that the hearing provided in that case was adequate, despite the fact that the applicant was not allowed to cross examine the other side. Id. at 646. The Court noted that the appellant did not offer to prove anything not apparent from the existing evidence and that cross examination was unlikely to add to an informed decision. Id. at 646-47. Further, the Court found that even if it were error, the error was harmless. Id. at 647.

In the case at bar, Chamberlain's request for an opportunity to present live testimonial evidence is based primarily on his assertion that he should be allowed to present evidence regarding the missing property and his decision not to pursue that property after that issue was raised. We find that Chamberlain's argument fails, primarily because Chamberlain is mistaken in the premise that the bankruptcy court reduced the fees because the property was missing or because it disagreed with Chamberlain's decision not to pursue it. Rather, the bankruptcy court reduced the fees because Chamberlain *wasted so much time trying to determine whether there was any truth to the allegations that it was missing.* This was caused by the simple failure to promptly conduct the inventory. In other words, the bankruptcy court concluded that if Chamberlain had conducted the inventory

51

in the first place, he could have either verified or refuted Kula's allegations from the first time they were raised and then most of the efforts required to make up for that omission would not have been necessary. Likewise, Chamberlain's decision not to pursue the missing property was irrelevant as to the fee award. The court did not reduce Chamberlain's fees because it thought he should have pursued the property rather than abandoning it. Again, the point was that

Chamberlain could not *respond* to the allegations, not that there was any provable merit to them or that Chamberlain could recover the property to benefit the estate.

Consequently, because the issues regarding the whereabouts, value, and recoverability of the missing property were irrelevant to the issue of Chamberlain's fees, it certainly was not error to deny the opportunity to present live testimony on those issues. Instead, the issues relevant to Chamberlain's reasonable fees were: (1) whether it was customary or appropriate for him to wait to conduct the inventory until some five months after he was appointed; (2) whether it was appropriate for him to allow the property to be removed by third persons before he had conducted an inventory and while Kula was in the hospital; (3) whether the failure to promptly inventory resulted in excessive fees; and (4) the reasonable number of hours and the reasonable rate that should have been charged in a similar case. If the failure to inventory caused excessive hours to be expended, they should not be included in the lodestar calculations.

In light of the foregoing discussion, on remand, the bankruptcy court is directed to make a lodestar calculation as described above and to issue findings to support that calculation. If further evidence is

necessary to support the findings, the bankruptcy court should allow Chamberlain the opportunity to present appropriate evidence as to those issues.

CONCLUSION


Accordingly, we REVERSE and REMAND to the bankruptcy court which shall make a lodestar calculation in accordance with this opinion. In all other respects, the decision of the bankruptcy court is affirmed.


A true copy.


Attest:



CLERK, U.S. BANKRUPTCY APPELLATE PANEL FOR THE EIGHTH CIRCUIT