# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

No. 98-6019NEO

_____

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Lockwood Corporation, | * | |
| | * | |
| Debtor. | * | |
| | * | Appeal from the United States |
| Hartford Fire Insurance Company, | * | Bankruptcy Court for the District |
| | * | of Nebraska |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Norwest Bank Minnesota, N.A., | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:  July 9, 1998
Filed: August 21, 1998

_____

Before KRESSEL, WILLIAM A. HILL, and FEDERMAN,[1] Bankruptcy Judges.

_____

WILLIAM A. HILL, Bankruptcy Judge.

Hartford Fire Insurance Company ("Hartford") appeals from the Order of the bankruptcy court denying its application to surcharge collateral of Norwest Bank of Minnesota, National Association ("Norwest"), pursuant to 11 U.S.C. § 506(c), for its post-

_____

[1]The Honorable Arthur B. Federman, United States Bankruptcy Judge for the Western District of Missouri, sitting by designation.

petition administrative expense claim in the amount of $164,635.12, which stems from unpaid workers' compensation insurance premiums incurred by the debtor, Lockwood Corporation ("Lockwood"), while a debtor-in-possession.

## I.  BACKGROUND

Prior to 1993, Lockwood was engaged in various lines of business, including the manufacture of agricultural equipment products.  It filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code ("Code") on January 29, 1993.  For several years thereafter, Lockwood operated its business as a debtor-in-possession.  Subsequently, on February 20, 1996, Lockwood's case was converted, on its own motion, to one under Chapter 7 of the Code.

Norwest was not a prepetition creditor of Lockwood.[2]  Rather, Norwest entered into a postpetition loan and security agreement ("loan agreement") with Lockwood, which was approved by the bankruptcy court by its February 4, 1994 "Final Order Authorizing Post-Petition Financing" ("Financing Order").

Pursuant to the loan agreement, Norwest provided Lockwood with a ten-million-dollar line of secured revolving credit to continue operating as a going concern.  In exchange, Norwest received a first priority attached and perfected security interest in Lockwood's collateral, as well as a security interest in all of Lockwood's real property, subject to the prior lien of FirsTier Bank.  Additionally, Norwest was granted a superpriority administrative expense claim in the event that its claim exceeded recovery from its collateral.  In this respect, the loan agreement provides as follows:

> Upon entry of the [Financing Order], pursuant to Section 364(c)(1) of the Bankruptcy Code, the Obligations of the Borrower to the Bank shall at all times constitute allowed administrative expense claims in the Case having priority over all administrative expenses of the kind specified in Sections

---

[2]Lockwood's prepetition lender was Washington Square Capital, Inc.

503(b) and 507(b) of the Bankruptcy Code subject only to, in the event of an Event of Default and foreclosure by Bank of its Security Interest granted hereunder, the Professional Fees and U.S. Trustee Fees, all of which shall not to [sic] exceed One Hundred Thousand Dollars ($100,000.00) in the aggregate for purposes of the Section . . . ;  the Professional Fees shall have a <u>Pari</u> <u>Passu</u> priority with the Super-Priority Claim granted to Bank hereunder and under the Final Order (the "Carve-Out");  the amount of the Carve-Out is to be shared on a pro-rata basis among such professionals. Bank's sole responsibility for such amount, if any, shall be to tender the same to an escrow agent designated by such professionals.

(Emphasis in the original).  Lastly, Norwest was purportedly immunized from any attempt to surcharge its collateral pursuant to 11 U.S.C. § 506(c) by virtue of the following provision within the loan agreement:  "Pursuant to the [Financing Order], the Security Interests granted hereunder shall have priority over all other Security Interests in the Collateral.  As of the date hereof the Collateral is not subject to any claim or Lien pursuant to Section 506(c) of the Bankruptcy Code."  In connection therewith, the Financing Order provided as follows:

Norwest and the Collateral shall be exempt from and not be subject to any surcharges, excises, liens or charges of any nature or type pursuant to [S]ections 363, 364, 506(c) and 510 of the Bankruptcy Code or otherwise, in this Chapter 11 case or any subsequent Chapter 7 cases including expenses of administration or liquidation.

While operating under the terms of the loan agreement and Financing Order, Norwest advanced in excess of five million dollars to Lockwood.  On December 18, 1995, after Lockwood defaulted on its reciprocal obligations, Norwest filed a "Notice of Exercising Remedies."  Subsequently, on December 29, 1995, and after authorization by the bankruptcy court, Norwest conducted a public secured party sale of its collateral, which resulted in a deficiency of $245,061.10.  On July 1, 1996, Norwest filed a proof of claim for its superpriority administrative expense in that amount.

Hartford provided pre- and postpetition workers' compensation insurance coverage to Lockwood.  In that connection, it filed a proof of claim on June 26, 1996, for an unsecured

priority administrative expense in the amount of $164,635.12, which the bankruptcy court allowed on July 26, 1996. On October 1, 1997, Hartford filed an application seeking to surcharge the collateral of Norwest, or the proceeds thereof, for $164,165.12 pursuant to 11 U.S.C. § 506(c), specifically alleging that:

> 3.      After the commencement of the bankruptcy case, and until about December 15, 1995, Hartford provided the Debtor with workers' compensation insurance. Such workers' compensation insurance was required by applicable law while the Debtor operated as a debtor-in-possession and the premiums and other charges relating thereto (collectively, "Post-Petition Premiums")were actual and necessary costs and expenses of preserving the Property of the Debtor's bankruptcy estate.
> [4.]     Hartford's providing worker's [sic] compensation insurance coverage to the Debtor directly benefited Norwest.
> [5.]     The Debtor failed to pay Hartford Post-Petition Premiums for post-petition workers' compensation coverage actually provided in the amount of $164,165.12.

On November 4, 1997, Norwest objected to the application and sought its denial by alleging, inter alia, that Hartford lacked standing under Section 506(c); that Hartford failed to plead or allege sufficient facts and law to support a claim under Section 506(c); and that the Financing Order immunized Norwest from any surcharge pursuant to Section 506(c). Subsequently, on November 21, 1997, Hartford moved the bankruptcy court for leave to conduct discovery with regard to its surcharge application.

In support of its discovery motion, Hartford alleged that Norwest's objection "raised certain issues, including whether Norwest benefited from worker's compensation insurance provided by Hartford." In this connection, Hartford further alleged that, "[e]vidence regarding Norwest's relationship with the Debtor, including Norwest's analysis of its secured status, the value of the collateral securing Norwest's claim at various times, liquidation of the collateral, and Norwest's credit analysis, which is unavailable to Hartford except through formal discovery, is necessary to fully and adequately litigation [sic] issues regarding [Hartford's surcharge application]."

A hearing was held in the matter on November 24, 1997. On January 29, 1998, the bankruptcy court entered its Memorandum Order denying Hartford's application upon two alternative bases. The Court held as follows: "Hartford does not have standing to assert a claim under section 506(c). Even if Hartford has standing, the Financing Order, entered by the Court and relied upon by Norwest, bars section 506(c) claims against Norwest or its collateral." The court did not directly pass on Hartford's motion to conduct discovery.

On appeal, Hartford argues, inter alia, that the bankruptcy court erred in holding that Hartford lacked standing to pursue its surcharge claim under Section 506(c), and in holding that the Financing Order immunized Norwest from Hartford's claim of surcharge. Norwest argues for an affirmance of the bankruptcy court's Memorandum Order in all respects.

## II. MOTION TO STRIKE

After Hartford filed its notice of appeal, Norwest moved to strike various items which Hartford had designated as part of the record on appeal. "An appellate court can properly consider only the record and facts before the [trial court] and thus only those papers and exhibits filed in the [trial court] can constitute the record on appeal." Huelsman v. Civic Ctr. Corp., 873 F.2d 1171, 1175 (8th Cir. 1989); accord Nantucket Investors II v. California Fed. Bank (In re Indian Palms Assocs., Ltd.), 61 F.3d 197, 201-203 (3d Cir. 1995) (district court properly denied motion to strike where documents sought to be stricken from appellate record, while not submitted to or reviewed by the bankruptcy court, had all been filed in the bankruptcy case record and thus were part of the relevant record). Therefore, documents presented for the first time at the appellate stage of any proceeding are generally not considered part of the record for review by the appellate court. Huelsman, 873 F.2d at 1175.[3]

---

[3]However, as the Eighth Circuit noted in Dakota Industries, Inc. v. Dakota Sportswear, Inc., 988 F.2d 61 (8th Cir. 1993), "[w]hen the interests of justice demand it, an appellate court may order the record of a case enlarged." Id. at 63; see Miller v. Benson, 51 F.3d 166, 168 (8th Cir. 1995) (quoting same).

None of the documents which Norwest seeks to have stricken from the record were newly presented in the appellate stage of these proceedings. Rather, each of the documents was filed or entered in the bankruptcy case record; indeed, many among them constitute orders of the bankruptcy court, itself, in this matter. Accordingly, these documents constitute part of the record on this appeal, and Norwest's motion will be denied. We now turn to address the merits of the instant appeal.

## III. DISCUSSION OF LAW

### 1.

On appeal, the findings of fact of the bankruptcy court are reviewed for clear error, and its legal determinations are reviewed de novo. See O'Neal v. Southwest Mo. Bank of Carthage (In re Broadview Lumber Co.), 118 F.3d 1246, 1250 (8th Cir. 1997); Natkin & Co. v. Myers (In re Rine & Rine Auctioneers, Inc.), 74 F.3d 848, 851 (8th Cir. 1996); Hartford Cas. Ins. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 214 B.R. 197, 199 (B.A.P. 8th Cir. 1997); see also Fed. R. Bankr. P. 8013.[4] "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 542, 92 L.Ed. 746 (1948)); accord United States v. Garrido, 38 F.3d 981, 984 (8th Cir. 1994); Chamberlain v. Kula (In re Kula), 213 B.R. 729, 735 (B.A.P. 8th Cir. 1997).

---

[4]Rule 8013 of the Federal Rules of Bankruptcy Procedure states, in pertinent part, as follows: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013.

**2.**

Generally, "normal administrative expenses of the bankruptcy estate may not be charged against secured collateral but may share in the distribution of the unencumbered assets of the debtor pursuant to 11 U.S.C. § 503." Internal Revenue Serv. v. Boatmen's First Nat'l Bank, 5 F.3d 1157, 1159 (8th Cir. 1993); see Hartford Underwriters Ins. Co. v. Magna Bank, N.A. (In re Hen House Interstate, Inc.), No. 97-3859, 1998 WL 416872, at *2 (8th Cir. July 27, 1998). An exception to this rule lies in Section 506(c), which provides that, "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim."[5] 11 U.S.C. § 506(c).

Under Section 506(c), the party claiming a right of surcharge bears the burden of proof in making a "relevant showing as to the bases for his request consistent with the requirements of [the section]." Halverson v. Estate of Cameron (In re Mathiason), 16 F.3d 234, 240 (8th Cir. 1994); accord Daniel v. AMCI, Inc. (In re Ferncrest Court Partners, Ltd.), 66 F.3d 778, 782 (6th Cir. 1995); Federal Deposit Ins. Corp. v. Jenson (In re Jenson), 980 F.2d 1254, 1260 (9th Cir. 1992); PSI, Inc. v. Aguillard (In re Senior-G & A Operating Co.), 957 F.2d 1290, 1298 (5th Cir. 1992). When a claimant fails to meet this burden, its surcharge application may be properly denied. See In re Mathiason, 16 F.3d at 240; see, e.g., United Jersey Bank v. Miller (In re C.S. Assocs.), 29 F.3d 903, 906 (3d Cir. 1994).

---

[5]However, and consonant with the general prohibition, Section 506(c) is not intended to be a conduit for the recovery of administrative expenses which would normally be paid out of the debtor's estate. Federal Deposit Ins. Corp. v. Jenson (In re Jenson), 980 F.2d 1254, 1260 (9th Cir. 1992) (citing Brookfield Prod. Credit Ass'n v. Borron, 738 F.2d 951, 952 (8th Cir. 1984)); Central Bank of Mont. v. Cascade Hydraulics & Util. Serv., Inc. (In re Cascade Hydraulics & Util. Serv., Inc.), 815 F.2d 546, 548 (9th Cir. 1987) (citing same). Rather, "[t]he underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs." PSI, Inc. v. Aguillard (In re Senior-G & A Operating Co.), 957 F.2d 1290, 1298 (5th Cir. 1992) (citation and internal quotation marks omitted).

A claimant under Section 506(c) may satisfy the required elements of the statute in either of two ways. First, the surcharge claimant can establish "that an expense . . . was necessary, reasonable, and *directly benefited* the secured creditor," In re Hen House Interstate, Inc., 1998 WL 416872, at *2 (citing Borron, 738 F.2d at 952) (emphasis added). Alternatively, the claimant must demonstrate that "the secured party either directly or impliedly consented to the expense."[6] In re Hen House Interstate, Inc., 1998 WL 416872, at *2; accord In re Ferncrest Court Partners, Ltd., 66 F.3d at 782. The Court will limit its discussion to the required elements under the former basis, that is, to the so-called "benefit test," upon which Hartford has exclusively premised its claim to a right of surcharge.

Under the benefit test, the surcharge claimant must "establish in quantifiable terms that it expended funds directly to protect or preserve the collateral" of the secured creditor. Central Bank of Mont. v. Cascade Hydraulics & Util. Serv., Inc. (In re Cascade Hydraulics & Util. Serv., Inc.), 815 F.2d 546, 548 (9th Cir. 1987); see Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.), 57 F.3d 321, 325 (3d Cir. 1995) (quoting same); Borron, 738 F.2d at 952. Thereafter, the claimant's recovery is limited to the extent that it demonstrates that the secured creditor *directly benefited* from the services or expenditure. See In re Hen House Interstate, Inc., 1998 WL 416872, at *2; In re Cascade Hydraulics & Util. Serv., Inc., 815 F.2d at 548; Borron, 738 F.2d at 952.

---

[6]Inferences of consent must not be hastily drawn. In this respect, the cautions voiced by the Court of Appeals for the Ninth Circuit in Central Bank of Mont. v. Cascade Hydraulics & Util. Serv., Inc. (In re Cascade Hydraulics & Util. Serv., Inc.), 815 F.2d 546 (9th Cir. 1987), echo with as much force today as they did when the ruling was handed down:

> Mere cooperation with the debtor does not make the secured creditor liable for all expenses of administration. To shift liability to the secured creditor would make it difficult, if not impossible, to induce new lenders to finance a [C]hapter 11 operation. It would discourage the trustee or debtor in possession from taking reasonable steps to expedite the reorganization and encourage negligence.

Id. at 548 (citations and internal quotation marks omitted).

Neither general assertions of benefit nor suggestions of hypothetical benefit will satisfy the surcharge claimant's burden of proving a direct benefit under Section 506(c). In re Cascade Hydraulics & Util. Serv., Inc., 815 F.2d at 548. Furthermore, while benefit to a secured creditor may be found "in the ambition of the creditor to preserve and improve its secured collateral and the opportunity to realize that ambition," Boatmen's First Nat'l Bank, 5 F.3d at 1160, nevertheless, "[e]xpenses undertaken to improve the position of the debtor-in-possession, although indirectly benefiting the creditor, are not recoverable," Borron, 738 F.2d at 952 (citation and internal quotation marks omitted). Accord Loudoun Leasing Devel. Co. v. Ford Motor Credit Co. (In re K& L Lakeland, Inc.), 128 F.3d 203, 211 (4th Cir. 1997) ("'Merely providing some benefit to the debtor . . . does not satisfy [Section] 506(c)'s requirement' that the benefit be direct and inure to the secured creditor for the preservation or disposition of its collateral.") (quoting In re Visual Indus., Inc., 57 F.3d at 327).

In the instant matter, the bankruptcy court denied Hartford's surcharge application in reliance upon two alternative bases. First, the court held that Hartford, never having been a "trustee" in the matter, lacked standing to bring an action pursuant to Section 506(c). Second, the court held that its prior Financing Order immunized Norwest and its collateral from surcharge claims arising under Section 506(c).

Since the entry of the bankruptcy court's Memorandum Order, the Eighth Circuit has had occasion to rule on both of these issues, in Hartford Underwriters Ins. Co. v. Magna Bank, N.A. (In re Hen House Interstate, Inc.), No. 97-3859, 1998 WL 416872 (8th Cir. July 27, 1998), thereby settling them for the purposes of this case. In Hen House, the Circuit Court, bound by its earlier decision in Boatmen's First National Bank, held that administrative claimants may assert their claims pursuant to Section 506(c), and also held that immunizing agreements, prohibiting surcharge payment obligations under Section 506(c), are unenforceable on the basis that such provisions "would operate as a windfall to the secured creditor at the expense of administrative claimants."[7] In re Hen House Interstate,

---

[7]We are constrained to follow the Eighth Circuit's expansive holding on this issue as binding precedent, and therefore, as controlling in the instant matter. However, it is important to note that the factual basis for its holding in Hen House differs markedly from

Inc., 1998 WL 416872, at \*2, 4. Thus, in the instant matter, Hartford, to borrow from analogous language within the Eighth Circuit's Hen House decision, "ha[s] standing under [Section] 506(c) to assert its administrative claim for unpaid workers' compensation insurance premiums," id., at \*2; and the provision in the Financing Order which purports to immunize Norwest from the surcharge expenses of secured creditors under Section 506(c) is unenforceable.

## IV. CONCLUSION

For the foregoing reasons, the Motion to Strike filed by Norwest on May 5, 1998, is DENIED, and the Order of the bankruptcy court entered on January 29, 1998, is REVERSED and REMANDED for further consideration in light of the ruling by the United States Court of Appeals for the Eighth Circuit in In re Hen House Interstate, Inc., 1998 WL 416872 (8th Cir. July 27, 1998).

---

that in the instant matter. Hen House concerned an immunizing agreement between a *prepetition* secured creditor and a debtor. The agreement in Hen House purported to protect the creditor's *prepetition* collateral. Under the instant facts, the immunizing provision was entered into postpetition by a *potential secured creditor contracting to immunize its potential future collateral from surcharge under Section 506(c)*. Hen House, in voiding this clause, and as applied to factual situations such as this, may indeed, as Norwest has suggested, cause the wellspring of postpetition lending by new lenders, to be greatly diminished, or even to evaporate completely.

Moreover, and just as importantly, these immunizing clauses are not only common in postpetition lending agreements, they are also common in cash collateral agreements. Therefore, the holding in Hen House not only raises new and significant obstacles for debtors in obtaining postpetition lending, but also makes it difficult for debtors in possession to negotiate cash collateral agreements with their prepetition lenders. Further, the Hen House decision also will also hinder courts from allowing the use of cash collateral, as such rulings must be based upon findings that a postpetition replacement lien will constitute adequate protection. Under the current precedent, as just discussed, this has now become, in many situations, an exceedingly difficult task to accomplish.

10

A true copy.

Attest:

CLERK, U.S. BANKRUPTCY APPELLATE PANEL, EIGHTH CIRCUIT.